[Civ. No. 24210. Third Dist. Mar. 28, 1986.]

MARIAN FUHRMAN, Plaintiff and Appellant, v.
CALIFORNIA SATELLITE SYSTEMS et al.,
Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976(b), the portion of the opinion to be published follows.

414

**COUNSEL**

Belli, Drivon & Bakerink, Belli, Shepherd & Belli, Rodney J. Shepherd, N. Kerry Rowan and Harold Seland for Plaintiff and Appellant.

Porter, Scott, Weiberg & Delehant, Mary F. LeVine, Ed Weiberg, Bronson, Bronson & McKinnon, Paul H. Cyril, Elliot L. Bien, Richard R. Dale and Alexander L. Brainerd for Defendants and Respondents.

OPINION

CARR, Acting P. J.—Plaintiff Marian Fuhrman appeals from a judgment dismissing her first amended complaint after the court sustained defendants' demurrers without leave to amend. The primary issue presented on appeal is whether two settlement demand letters sent by defendants to plaintiff and several thousand other residents of Sacramento County are absolutely privileged as publications made in connection with a judicial proceeding. (Civ. Code, § 47, subd. 2.)

We conclude that under the present posture of the case the trial court erred in finding as a fact that the letters are absolutely privileged and on that ground sustaining the demurrers without leave to amend. As to part of the complaint, the demurrers were properly sustained without leave to amend on other grounds. Accordingly, we shall reverse in part and affirm in part.

FACTUAL AND PROCEDURAL BACKGROUND

We accept as true all material facts properly pleaded in plaintiff's first amended complaint. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 213-214 [197 Cal.Rptr. 783, 673 P.2d 660].) Plaintiff is a resident of Sacramento County and has a television antenna on her residence which was installed prior to her occupancy. On December 6, 1983, plaintiff received a form letter from defendant Roger Stewart, an attorney representing defendant California Satellite Systems (Cal-Sat), accusing her of having a microwave antenna on her residence which is tuned to and receiving transmissions of "ON TV" television programming.[1] Cal-Sat is the sole licensee for microwave transmission of ON TV programming in the Sacramento metropolitan area. The letter further stated plaintiff was receiving the ON TV signal without paying the monthly subscriber fee and that such unauthorized reception of a pay television signal violated federal law, entitling Cal-Sat to damages of $100 per day or a minimum of $1,000, whichever is greater.

Stewart advised that Cal-Sat had instructed him to file suit against plaintiff in federal court unless plaintiff (1) removed the unauthorized equipment; (2) signed an attached agreement to stop illegal reception of the ON TV signal; and (3) paid Cal-Sat $275 by January 9, 1984, as a settlement of Cal-Sat's claims against plaintiff. Stewart stated this was plaintiff's only opportunity to settle the claim. The same letter was sent to approximately 8,700 persons.

[1]The letter is reproduced in appendix A to this opinion.

Defendants' accusations were made without reasonable grounds for believing they were true. Plaintiff's antenna is not a microwave receiver. She was not receiving nor had she ever received Cal-Sat's On TV transmission. On December 9, 1983, plaintiff wrote to Stewart explaining that she never used the antenna on her roof and her television was not connected to it. She invited someone from Cal-Sat to inspect her residence to verify her statements.

On December 30, Michael Dawson, general manager of Cal-Sat, sent another form letter to plaintiff. Dawson reminded her of Stewart's previous letter and, apparently trying to cover all bases, stated that Cal-Sat had either not received a satisfactory response from plaintiff or not heard from her at all.[2] Dawson stated Cal-Sat was following procedures "utilized by several other successful anti-piracy programs throughout the country" and had instructed its attorney "to pursue this piracy campaign to the fullest extent." Dawson attached a notice from the Federal Communications Commission stating it is illegal to receive an "MDS" signal such as Cal-Sat's without the authorization of the sender. Dawson reiterated that January 9, 1984, was the final date on which plaintiff could settle the matter according to Cal-Sat's terms. Other recipients of Stewart's letter attempted to explain their positions but were either ignored or their explanations were summarily rejected by Cal-Sat.

On January 19, 1984, plaintiff filed an amended class action complaint on behalf of herself and all 8,700 recipients of the letters described herein. Other members of the class have either received the Cal-Sat signal but discontinued its reception, continued its reception as a subscriber, or continued its reception without subscribing.

The complaint alleges seven causes of action: extortion, fraud, negligent misrepresentation, invasion of privacy, intentional infliction of emotional distress, conspiracy and violation of the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.). As to each of the first six causes of action, plaintiff alleges damages consisting of "severe intimidation, shock, distress, humiliation, alarm, frustration, harassment, embarrassment, defamation and disruption" and expenditure of "sums of money for legal advice and representation . . . ." In addition, in each of the first six causes of action, plaintiff seeks punitive damages under Civil Code section 3294 in the amount of $87 million, or $10,000 as to each class member. In the seventh cause of action, violation of the Fair Debt Collection Practices Act, plaintiff

---

[2]The letter is reproduced in appendix B to this opinion.

seeks damages of $1,000 per named plaintiff plus $500,000 or 1 percent of the net worth of Cal-Sat and defendant Graphic Scanning, Cal-Sat's parent company.

On March 13, 1984, Cal-Sat filed a voluminous general and special demurrer to the complaint and a motion to strike the complaint. In support of the demurrer and motion to strike, Cal-Sat argued the causes of action for extortion, fraud, negligent misrepresentation, intentional infliction of emotional distress, and conspiracy were barred by the absolute privilege which cloaks publications by parties in connection with a pending or contemplated judicial proceeding. (Civ. Code, § 47, subd. 2.)[3] Cal-Sat further claimed a qualified privilege for good faith assertion of its legal rights while pursuing its economic interests. Cal-Sat separately demurred to all causes of action on grounds of uncertainty, vagueness and ambiguity, insufficient facts to constitute the causes of action, and insufficient facts to support punitive damages as to the first through sixth causes of action. The demurrer to the class allegations was on the ground plaintiffs do not meet the requirements for a class action.

On March 26, 1984, defendants Roger T. Stewart and Stewart's employer, the law firm of Weintraub, Genshlea, Hardy, Erich & Brown, filed a general and special demurrer to the first through sixth causes of action on grounds of absolute privilege, failure to state sufficient facts to constitute causes of action, and uncertainty and ambiguity.

The matter was argued May 7, 1984, and the court sustained the demurrers without leave to amend as to the entire complaint. The court concluded "as a matter of factual finding" that the letters were subject to the absolute privilege of Civil Code section 47 and on that basis sustained the demurrers to the actions for extortion, fraud, negligent misrepresentation, intentional infliction of emotional distress, and conspiracy. Cal-Sat's demurrer to the action under the federal debt collection law was sustained on the ground that "Cal-Sat [does not] fall[] into the definition of the federal legislation, . . ." The court also ruled the action was not properly a class action. As to the cause of action for invasion of privacy, the court felt the deficiencies of the complaint could be cured by amendment, but, at the request of plaintiff's counsel, sustained the demurrers to that action without leave to amend to allow plaintiff to appeal the entire matter. The complaint was then dismissed.

---

[3]Civil Code section 47, subdivision 2, provides in pertinent part: "A privileged publication or broadcast is one made—. . . [¶] 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law, . . ."

DISCUSSION

I

The sole question presented by the parties on appeal is whether the letters sent by defendants are absolutely privileged under Civil Code section 47, subdivision 2. ■ For reasons herein stated, we conclude the trial court erred in factually finding at the demurrer stage that the letters are absolutely privileged. However, since "it is the validity of the court's action in sustaining the demurrer which is reviewable and not the court's statement of reasons for its action" (*Franchise Tax Board* v. *Firestone Tire & Rubber Co.* (1978) 87 Cal.App.3d 878, 883 [151 Cal.Rptr. 460]), we examine each cause of action to determine whether there are any other grounds for sustaining demurrers without leave to amend.

■ The privilege of section 47, subdivision 2, extends to a publication "(1) made in a judicial proceeding; (2) with a connection or logical relation to the action; (3) made to achieve the objects of the litigation; and (4) involving the litigants or other participants authorized by law." (*Asia Investment Co.* v. *Borowski* (1982) 133 Cal.App.3d 832, 842 [184 Cal.Rptr. 317, 30 A.L.R.4th 561]; *Costa* v. *Superior Court* (1984) 157 Cal.App.3d 673, 677 [204 Cal.Rptr. 1]; *Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 824 [106 Cal.Rptr. 718].)

"The privileges of Civil Code section 47, unlike evidentiary privileges which function by the exclusion of evidence . . ., operate as limitations upon liability. . . . The assertion of the privilege as a defense is thus a direct challenge to liability." (*Block* v. *Sacramento Clinical Labs, Inc.* (1982) 131 Cal.App.3d 386, 389 [182 Cal.Rptr. 438].) The "purpose of section 47 is to afford litigants freedom of access to the courts to secure and defend their rights without fear of being harassed by actions for defamation [citations], and to promote the unfettered administration of justice even though as an incidental result it may in some instances provide an immunity to the evil-disposed and malignant slanderer [citations]." (*Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d at p. 823, italics omitted; *Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200, 232 [194 Cal.Rptr. 180]; *Block* v. *Sacramento Clinical Labs, Inc., supra,* 131 Cal.App.3d at p. 394.) When a publication meets the requirements set out above, the privilege is absolute and unaffected by the presence of malice. (*Costa* v. *Superior Court, supra,* 157 Cal.App.3d at p. 677; *Izzi* v. *Rellas* (1980) 104 Cal.App.3d 254, 265 [163 Cal.Rptr. 639]; *Tiedemann* v. *Superior Court* (1978) 83 Cal.App.3d 918, 924 [148 Cal.Rptr. 242].)

■ "The privilege created by Civil Code section 47, though part of the statutory law dealing with defamation, has evolved through case law appli-

cation into a rather broad protective device which attaches to various classes of persons and applies to types of publications and in types of actions not traditionally identified with the field of defamation." (*Rosenthal* v. *Irell & Manella* (1982) 135 Cal.App.3d 121, 125 [185 Cal.Rptr. 92]; see also *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 364 [212 Cal.Rptr. 143, 696 P.2d 637].) Where a privileged publication formed the basis for the tort, section 47 has been used to defeat actions for abuse of process (*Asia Investment Co.* v. *Borowski, supra,* 133 Cal.App.3d 832; *Umansky* v. *Urguhart* (1978) 84 Cal.App.3d 368 [148 Cal.Rptr. 547]); intentional infliction of emotional distress (*Ribas* v. *Clark, supra,* 38 Cal.3d 355; *Rosenthal* v. *Irell & Manella, supra,* 135 Cal.App.3d 121; *Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573 [131 Cal.Rptr. 592]); inducing breach of contract (*Rosenthal* v. *Irell & Manella, supra; Agostini* v. *Strycula* (1965) 231 Cal.App.2d 804 [42 Cal.Rptr. 314]); interference with prospective economic advantage (*Rosenthal* v. *Irell & Manella, supra; Brody* v. *Montalbano* (1978) 87 Cal.App.3d 725 [151 Cal.Rptr. 206]); negligent misrepresentation (*Portman* v. *George McDonald Law Corp.* (1979) 99 Cal.App.3d 988 [160 Cal.Rptr. 505]; *Pettitt* v. *Levy* (1972) 28 Cal.App.3d 484 [104 Cal.Rptr. 650]); invasion of privacy (*Ribas* v. *Clark, supra,* 38 Cal.3d 355); negligence (*Block* v. *Sacramento Clinical Labs, Inc., supra,* 131 Cal.App.3d 386; *Pettitt* v. *Levy, supra,* 28 Cal.App.3d 484); and fraud (*Pettitt* v. *Levy, supra*). The only exception is for malicious prosecution actions. (*Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 382 [295 P.2d 405]; *Block* v. *Sacramento Clinical Labs, Inc., supra,* 131 Cal.App.3d at p. 392.)

■ In addition to applying the privilege to a wide range of tort actions, courts "have consistently applied a liberal standard for establishing a relationship between publications made by parties and judicial proceedings." (*Izzi* v. *Rellas, supra,* 104 Cal.App.3d at p. 262.) If the requirements of the privilege are met, the privilege applies though the publication is made outside of the courtroom and no function of the court or its officers is invoked. (*Albertson* v. *Raboff, supra,* 46 Cal.2d at p. 381.)

■ The privilege applies as well to communications preliminary to a proposed judicial proceeding (Rest.2d Torts, § 586 & com. *a.*, p. 247) and has been specifically applied to letters demanding settlement of a claim and warning of the alternative of judicial action. (*Larmour* v. *Campanale* (1979) 96 Cal.App.3d 566 [158 Cal.Rptr. 143]; *Lerette* v. *Dean Witter Organization, Inc., supra,* 60 Cal.App.3d 573.) It is a "well established legal practice to communicate promptly with a potential adversary, setting out the claims made upon him, urging settlement, and warning of the alternative of judicial action." (*Lerette* v. *Dean Witter Organization, Inc., supra,* at p. 577.) Any veiled threat contained in such a letter " 'is part of the adversary system, and, as such, is to be anticipated in the course of "heated

battle" between adverse parties to proceedings considered to be within the context of "judicial proceedings." '" (*Asia Investment Co.* v. *Borowski, supra,* 133 Cal.App.3d at p. 843.)

■ The privilege is not limitless, however. " '[T]he application of the absolute privilege *on certain occasions* must be confined within narrow limits and the tendency of the courts is not to extend such limits unless the public policy upon which the privilege rests is found to exist in a new situation. Accordingly, while it has been held that there is a tendency to extend the absolute privilege to occasions where the communication is provided for and required by law, the class of occasions where the publication of defamatory matter is absolutely privileged is confined to cases in which the public service or the administration of justice requires complete immunity.' " (*Earp* v. *Nobmann* (1981) 122 Cal.App.3d 270, 283 [175 Cal.Rptr. 767]; quoting *Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d at p. 824; original italics.) Thus, " '*special emphasis must be laid on the requirement that* [the publication] *be made in furtherance of the litigation and to promote the interest of justice.* Only if this requirement has been satisfied, is it appropriate for the courts to define liberally the scope of the term "judicial proceeding" and the persons who should be regarded as litigants or other participants.' " (*Id.,* at p. 284, original italics.)[4]

■ In accordance with this limitation, the privilege with respect to prelitigation communications is subject to an important qualification. "As to communications preliminary to a proposed judicial proceeding the [privilege] . . . applies only when the communication has some relation to a proceeding *that is contemplated in good faith and under serious consideration.* The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility *is not seriously considered.*" (Rest.2d Torts, § 586, com. *e,* at p. 248, italics added [see also, com. *e* to §§ 587 and 588].) This rule was applied in *Herzog* v. *"A" Company, Inc.* (1982) 138 Cal.App.3d 656 [188 Cal.Rptr. 155], wherein the court reversed a judgment on the pleadings in an action arising out of a letter threatening possible suit against a former employee, as the letter was "not related to a potential judicial action contemplated for legitimate purposes . . . ." (*Id.,* at pp. 662-663.) ■ ■ ■ ■ The court stated the defendant would be able to raise the privilege "as an affirmative defense at trial, if it can show the letter was . . . a good faith communication about prospective litigation contemplated for legitimate purposes." (*Id.,* at p. 662, fn. 5; see also, *Block* v. *Sacramento Clinical Labs,*

---

[4]The rationale of *Bradley* v. *Hartford Acc. & Indem. Co., supra,* as followed by *Earp* v. *Nobmann, supra,* was recently reaffirmed by the First District in *Barbary Coast Furniture Co.* v. *Sjolie* (1985) 167 Cal.App.3d 319, 333, 334 [213 Cal.Rptr. 168].

*Inc., supra,* 131 Cal.App.3d at p. 393, and *Larmour* v. *Campanale, supra,* 96 Cal.App.3d at p. 569, fn. 2, both of which recognize the restatement rule.)[5]

Plaintiff's complaint raises a serious question whether the letters in this case were published in good faith and serious contemplation of litigation. The first letter is a form letter sent to approximately 8,700 residents of the county. This alone raises doubt as to the seriousness of Cal-Sat's threat to file suit. The letter provides no factual support for the allegations made against individual residents. It leaves no room for negotiation or explanation, but states it represents the "only opportunity to settle this claim for this amount." When plaintiff attempted to deny defendants' allegations, Cal-Sat simply sent a second form letter stating it had "not received a satisfactory response" or no response at all. Cal-Sat accused plaintiff of "piracy" and repeated its demands. There is no indication Cal-Sat ever considered plaintiff's response or attempted to verify her claims. Many other recipients of the letter attempted to explain their positions, only to be summarily rejected by Cal-Sat. The only apparent "satisfactory" response was total compliance with Cal-Sat's demands. If even a small percentage of the recipients of the letters acceded to these demands, Cal-Sat would reap considerable sums of money.

We conclude the court erred in finding as a fact that the letters were privileged under Civil Code section 47, subdivision 2. Plaintiff's complaint casts serious doubt on the good faith of defendants and raises a factual question whether the letters fall within the privilege. If defendants assert the privilege as an affirmative defense, they may defeat plaintiff's action by showing they published the letters in good faith and serious contemplation of litigation against her. (*Herzog* v. *"A" Company, Inc., supra,* 138 Cal.App.3d at p. 662, fn. 5.)[6] But this is an issue of fact not properly resolved on a demurrer. The demurrer tests the pleading alone, not evidence or other matters; defendants cannot set forth allegations of fact in

---

[5]It is important to distinguish between the lack of a good faith intention to bring a suit and publications which are made without a good faith belief in their truth, i.e., malicious publications. The latter, when made in good faith anticipation of litigation, are protected as part of the price paid for affording litigants the utmost freedom of access to the courts. This policy consideration is not advanced, however, when the person publishing an injurious falsehood is not seriously considering litigation. In such a case, the publication has no "connection or logical relation" to an action and is not made "to achieve the objects" of any litigation (*Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d at p. 824). No public policy supports extending a privilege to persons who attempt to profit from hollow threats of litigation.

[6]It is not necessary that plaintiff allege the letters were not published in good faith and serious contemplation of litigation. A plaintiff is not required to plead negative facts to anticipate a defense. (*Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 422 [282 P.2d 890]; *Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d at p. 825.)

their demurrers which, if true, would defeat plaintiff's complaint. (3 Witkin, Cal. Procedure, Pleading (2d ed. 1971) § 797, p. 2410.)[7]

## II

We next consider the individual causes of action to determine if the demurrer was sustainable on any ground. ■ Initially we note "that by statutory mandate the allegations of a complaint must be liberally construed with a view to substantial justice between the parties (Code Civ. Proc., § 452). . . . [T]he essence is fairness in pleading in order to give the defendant sufficient notice of the cause of action stated against him so that he will be able to prepare his case [citations]. A party is no longer required to plead with common law exactness, and less particularity is needed where it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy [citations.] ■ It is unnecessary and improper to allege evidentiary facts [citations], and plaintiff is not required to plead negative facts to anticipate a defense [citations]." (*Bradley* v. *Hartford Acc. & Indem. Co., supra,* 30 Cal.App.3d at p. 825.)

### A. *Class Action*

■ "Procedurally, where there is a 'reasonable possibility' that the plaintiff in a class action can establish a community of interest among potential claimants, the preferred course is to defer decision on the propriety of the class action until an evidentiary hearing has been held on the appropriateness of class litigation. [Citations.] But when the complaint on its face fails to contain sufficient allegations of fact to establish a class interest, the class issue may be properly disposed of by demurrer." (*Rose* v. *Medtronics, Inc.* (1980) 107 Cal.App.3d 150, 154 [166 Cal.Rptr. 16]; *Brown* v. *Regents of University of California* (1984) 151 Cal.App.3d 982, 988-989 [198 Cal.Rptr. 916].)

---

[7]Cases cited in which appellate courts have upheld dismissals after sustaining without leave demurrers to actions based on prelitigation demand letters are distinguishable. In *Lerette* v. *Dean Witter Organization, Inc., supra,* 60 Cal.App.3d 573, a bank president sued the defendant for defamation and intentional infliction of emotional distress allegedly caused by a demand letter in which defendant accused plaintiff of intentionally misrepresenting the financial condition of a person to whom defendant subsequently extended credit. Defendant threatened to sue plaintiff unless within 30 days his attorney contacted defendant's attorney to commence settlement negotiations. (At pp. 579-581.) The letter was sent to a single person and was an open invitation to negotiation. Most importantly, defendant actually filed suit against plaintiff shortly after he wrote the letter. (At p. 576, fn. 5.) There was no question the letter was sent in serious contemplation of litigation and was connected to a judicial proceeding.

Similarly distinguishable is *Larmour* v. *Campanale, supra,* 96 Cal.App.3d 566. In other cases, settlement letters were sent while an action was pending. (See *Asia Investment Co.* v. *Borowski, supra,* 133 Cal.App.3d 832; *Izzi* v. *Rellas, supra,* 104 Cal.App.3d 254.)

▮ Plaintiff alleges the class members are approximately 8,700 persons all of whom received the demand letter from defendant Stewart and all issues of fact and law are common to each member of the class. Plaintiff alleges that while she has never received Cal-Sat microwave signal, "[o]ther members of the class either have received the Cal-Sat's signal but discontinued its reception, continued its reception as a subscriber, or continued its reception as a non-subscriber." All members asserted they are not in violation of federal law as alleged by Stewart. Plaintiff alleges many of the class members have attempted to explain their relative positions but have been ignored by defendants. Plaintiff seeks damages on behalf of the class "for the distress, alarm, frustration, dismay and shock from the receipt of such letters, as well as exemplary and punitive damages . . . in an amount [not] less than $10,000.00 per class member."

▮ "A class action is maintainable only when there exists a community of interest in common questions of law and fact among the claimants to be represented, and it is likely that the combination of claims in a single action will substantially benefit both the claimants and the courts. (Civ. Code, § 1781; Code Civ. Proc., § 382; *Vasquez* v. *Superior Court* [(1971)] 4 Cal.3d 800, 809-810 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 704 [63 Cal.Rptr. 724, 433 P.2d 732].) If each member of the class will be required to litigate numerous and substantial issues affecting his individual right to recover damages after the common questions have been determined, the requirement of community of interest is not satisfied. [Citations.] ▮ [¶] A dispute over the propriety of a class action requires the court to evaluate the factors necessarily involved in the particular action. In general, mass tort actions for personal injuries are *not appropriate for class-action treatment* (Fed. Rules Civ. Proc., rule 23, Supplemental Notes of Advisory Com., reported in 28 U.S.C.A., rule 23, p. 299), in that the major elements in tort actions for personal injuries—liability, causation, and damages—may vary widely from claim to claim. Reluctance to extend class-action treatment to mass torts governs even those types of claims which necessarily contain common questions of law and fact. This is most clearly seen in airplane accident causes, where, although the injuries indubitably possess a common origin, courts decline to adjudicate such causes as class actions. [Citations.] Rather, consolidation of actions is the preferred procedure for disposition of such causes. The reasons behind the reluctance to process mass torts as class actions are twofold: first, the great importance of tort claims for personal injuries to the claimants themselves and the consequent desire of claimants to be represented by counsel of their own choosing rather than by strangers, and, second, the wide disparity in damages that ordinarily arises from such claims. And once we leave those types of mass torts which necessarily involve common causation, the issues become further diversified by indi-

vidual causation." (*Rose* v. *Medtronics, Inc., supra,* 107 Cal.App.3d at pp. 154-155.)

Plaintiff's complaint is not appropriate as a class action. First, the class members are not similarly situated. Plaintiff alleges she has never received Cal-Sat's signal and that defendants factually erred in sending her the letters. Other members of the class, however, did receive the signal and either discontinued doing so, continued doing so as subscribers, or continued doing so without subscribing. These members would acknowledge their receipt of the signal but contend the receipt of Cal-Sat's signal was not illegal.

Second, the injury alleged in each of the first six causes of action is "severe intimidation, shock, distress, humiliation, alarm, frustration, harassment, embarrassment, defamation and disruption . . . ." Perhaps no cause of action is less susceptible to a class action than one for infliction of emotional distress. Recovery in each case necessarily depends on the particular characteristics of each plaintiff. Every plaintiff will have a different degree of susceptibility and emotional reaction to the conduct in question. If the legal issues were common to all class members, the individual right of each member to damages and the extent of those damages would have to be separately litigated. While each class member is similarly situated in that each received the letters in question, each member must establish his or her right to recover on the basis of facts peculiar to his or her own case. A class action is inappropriate in such a case. (*Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 707-708; *Chance* v. *Superior Court* (1962) 58 Cal.2d 275, 285 [23 Cal.Rptr. 761, 373 P.2d 849].)

Plaintiff's action "is singularly ill-suited for prosecution as a class action, . . . Plaintiff's individual action provides [her] a sufficient vehicle to remedy any wrong [she] may have suffered as a result of defendant[s'] conduct." (*Rose* v. *Medtronics, Inc., supra,* 107 Cal.App.3d at p. 157.)

A class action may be appropriate for the seventh cause of action, violation of the Fair Debt Collection Practices Act. However, as we determine plaintiff's complaint irremediably fails to state a cause of action under that enactment, we do not consider this issue.

The court properly sustained Cal-Sat's demurrer without leave to amend as to all unnamed class plaintiffs.

B. *Extortion*

Plaintiff's first cause of action is labelled "extortion" and states defendants "have, through outrageous conduct, demanded, among other things,

sums of money under a threat of apparent civil and criminal prosecution amounting to extortion and blackmail." As a result of such conduct, plaintiff "has suffered severe intimidation, shock, distress, humiliation, alarm, frustration, harrassment [*sic*], embarrassment, defamation and disruption all to her general damage . . . ." Plaintiff alleges she has also "been required to expend sums of money for legal advice and representation . . . ." Further, defendants' conduct "amounted to oppression, fraud, malice, and conscious disregard for the rights and feelings of others" within the meaning of [Civil Code section] 3294, entitling plaintiff to punitive damages in excess of $87 million.

■ In their demurrers, defendants contend "extortion" is only a crime and cannot form the basis for a civil action in tort. We disagree. However denominated (e.g., extortion, menace, duress), our Supreme Court has recognized a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution. (See *Leeper v. Beltrami* (1959) 53 Cal.2d 195, 203-204 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]; *Woodham v. Allen* (1900) 130 Cal. 194, 198-200 [62 P. 398].) It is essentially a cause of action for moneys obtained by duress, a form of fraud. (*Leeper v. Beltrami, supra,* 53 Cal.2d at pp. 205, 207.)

To be actionable the threat of prosecution must be made with the knowledge of the falsity of the claim. (*Id.,* at p. 204.) In her first cause of action, plaintiff does not allege defendants knew their claims were false, other than a general statement that their conduct amounted to "fraud." This can be cured by amendment.

■ The fatal flaw in plaintiff's action is that she apparently *never paid* the money defendants demanded in their letters. The only actual damages plaintiff alleges are her emotional distress and attorney fees.

Attorney fees are not recoverable here, as there is no agreement for the payment of fees and no applicable statutory provision for the recovery of fees. (Code Civ. Proc., § 1021.) In *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], the court suggests, in somewhat broad language, that whenever attorney fees are incurred as a result of the defendant's tortious conduct, such fees are an economic loss and therefore recoverable as damages. However, we construe such language to be limited to the factual setting of *Brandt, supra,* and the particular conduct at issue. The precise issue in *Brandt* was articulated at the beginning of the opinion: "When an insurer tortiously withholds benefits, are attorney's fees, reasonably incurred to compel payment of the policy benefits, recoverable as an element of the damages resulting from such tortious conduct? We hold that they are . . . ." (37 Cal.3d at p. 815, fn. omitted.) "When an insurer's

tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort . . . ." (37 Cal.3d at p. 817.)

The *Brandt* action was one against an insurer by its insured for refusal to pay benefits under a group disability policy. Three causes of action were pled, but only two were before the Supreme Court, the first for breach of an insurance contract and the second for breach of the covenant of good faith and fair dealing. In the latter cause of action, attorney fees incurred in connection with the breach of contract action were sought as part of the damages. The trial court granted defendant's motion to strike that portion of the complaint seeking attorney fees; plaintiff successfully sought mandate to vacate the order striking the attorney fees portions of the complaint.[8]

*Brandt* is distinguishable from the present case in that in Brandt there was an underlying contractual relationship. Defendant insurer's unreasonable and bad faith breach of that contract compelled the incurring of legal fees to enforce the contractual rights and collect the benefits due. It is the bad faith, tortious conduct in withholding these contractual benefits which gave rise to the cause of action for breach of the covenant of good faith and fair dealing. Part of the damages for that cause of action are the attorneys fees incurred or paid to enforce the contractual right. The *Brandt* court carefully delineated the recoverable and nonrecoverable fees: "The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (37 Cal.3d at p. 819.)

In *Brandt,* the court as well noted the difference between the *Brandt* action and an action to recover only benefits allegedly due under an insurance contract and in which no bad faith in refusing such benefits is alleged, as was the situation in *Lowell* v. *Maryland Casualty Co.* (1966) 65 Cal.2d 298 [54 Cal.Rptr. 116, 419 P.2d 180]; *Patterson* v. *Insurance Co. of North America* (1970) 6 Cal.App.3d 310 [85 Cal.Rptr. 665], and *Carroll* v. *Hanover Insurance Co.* (1968) 266 Cal.App.2d 47 [71 Cal.Rptr. 868]. An award of attorney fees is precluded in those cases in which the insurer

---

[8]As the *Brandt* court inferentially observed, the usual method is to proceed with the contract action first to recover benefits due, then to file a second action for the tort cause of action.

However, no disadvantage accrues to the defendant in joining the two actions in one lawsuit, save possibly making "the identification of the allowable fees more sophisticated." (37 Cal.3d at p. 818.)

erroneously but in good faith withheld benefits from the insured. Plaintiff has stated no basis for the recovery of attorney fees incurred prior to any action instituted by her.

If plaintiff had actually paid the money demanded by defendants, she would have alleged such sum as damages. An action for duress is an action for the recovery of moneys received by a defendant under the influence of duress. (See *Leeper* v. *Beltrami, supra,* 53 Cal.2d 195; *Woodham* v. *Allen, supra,* 130 Cal. 194.) As she did not pay the money demanded by defendants, plaintiff did not sustain damages cognizable in a cause of action for duress. ▮▮▮ In the absence of actual damages, punitive damages are not recoverable. (*Esparza* v. *Specht* (1976) 55 Cal.App.3d 1, 6 [127 Cal.Rptr. 493].)

We consider next whether this cause of action can be upheld on some other theory. However labelled, plaintiff's first cause of action could be construed as one for the recovery of damages for the severe emotional distress caused by defendants' "outrageous" conduct. As such, it is simply a variation of the tort of intentional infliction of emotional distress. (See *Ribas* v. *Clark, supra,* 38 Cal.3d at p. 364.) Plaintiff alleges such a cause of action later in the complaint and we consider it later. The court properly sustained the demurrers without leave to amend as to the first cause of action.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .*

## H. *Fair Debt Collection Practices Act*

▮▮▮ As a seventh cause of action against Cal-Sat and Graphic Scanning only, plaintiff alleges defendants violated the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.) and seeks damages in the amount of $1,000 per named plaintiff and $500,000 or one percent of the net worth of Cal-Sat and Graphic Scanning.

The general purpose of Congress in enacting the Fair Debt Collection Practices Act (Act) is to protect consumers who have been victimized by unscrupulous and abusive debt collectors, regardless of whether a valid debt actually exists. (*Baker* v. *G. C. Services Corp.* (9th Cir. 1982) 677 F.2d 775, 777; 15 U.S.C. § 1692(d).)

▮▮▮ The trial court sustained Cal-Sat's demurrer to this cause of action on the ground Cal-Sat was not a "debt collector" within the meaning of the Act. The Act subjects to liability any "debt collector" who fails to comply

---

*See footnote, *ante,* page 408.

with the provisions of the Act. (15 U.S.C. § 1692.) A "debt collector" is a person, who among other things, "uses any instrumentality of interstate commerce or the mails in any business *the principal purpose of which* is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due *another*. . . ." (15 U.S.C. § 1692a(6); italics added.) The Act expressly exempts from coverage "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor"; and "any attorney-at-law collecting a debt as an attorney on behalf of and in the name of a client; . . ." (15 U.S.C. § 1692a(6)A and (6)(F).) The "debt collectors" covered by the Act "are those who regularly collect debts for others and not creditors of consumers" or employees or attorneys representing creditors. (*Kizer* v. *Finance America Credit Corp.* (N.D.Miss. 1978) 454 F.Supp. 937, 939.)[10] The only exception for a creditor is for one "who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." (15 U.S.C. § 1692a(6).)

The complaint shows on its face Cal-Sat is not a "debt-collector" within the meaning of the Act. Cal-Sat was directly attempting to collect money allegedly owed to it as a creditor. The first letter was written by its attorney while acting on its behalf and in its name; the second letter was written by its general manager.

Cal-Sat is not subject to the Act and no amendment to the complaint can make it so. The court properly sustained Cal-Sat's demurrer without leave to amend as to the seventh cause of action.

### DISPOSITION

The judgment of dismissal is affirmed as to the first, second, third, and seventh causes of action, and as to the unnamed class plaintiffs. The judgment of dismissal as to the fourth, fifth, and sixth causes of action is reversed with directions to vacate the order sustaining the demurrers without leave to amend and to sustain the demurrers with leave to amend as to those causes of action. Each party shall bear its own costs on appeal.

Sparks, J., concurred.

**SIMS, J.**—I concur with the thoughtful majority opinion except insofar as it concludes plaintiff cannot recover attorneys' fees as damages in her cause

---

[10]A "creditor" is, in relevant part, "any person who offers or extends credit creating a debt or to whom a debt is owed, . . ." (15 U.S.C. § 1692a(4).)

of action for "extortion." In my view, decisions of our Supreme Court, including *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], compel the conclusion that plaintiff should be entitled to recover, as damages, amounts paid to her attorneys to the extent their services were necessary to make defendants cease their threats of suit. Since plaintiff is entitled to pursue such a claim for damages, plaintiff's first cause of action for "extortion" should survive. I respectfully dissent from the majority opinion to the extent it reaches contrary conclusions.

In *Brandt* our Supreme Court ruled a plaintiff could collect, as damages, fees paid by plaintiff to his attorneys and attributable to the attorneys' effort to obtain benefits wrongfully withheld on an insurance contract. (37 Cal.3d at p. 819.)

The majority conclude *Brandt* is inapplicable to this case either because *Brandt* should be limited to disputes over insurance or because recovery of attorneys' fees in *Brandt* was on a contract theory. (Maj. opn., *ante*, p. 427.)

The majority's latter ground for distinguishing *Brandt* is wholly unpersuasive. The *Brandt* opinion makes clear that plaintiff's cause of action was in tort for breach of the duty of good faith and fair dealing and the entire thrust of the case is that fees paid to plaintiff's attorney are recoverable as tort damages. (See *Brandt, supra,* 37 Cal.3d at pp. 816-818.) *Brandt*'s approval of attorneys' fees as damages has nothing to do with any contract.

Nor does *Brandt* suggest that there is anything in its analysis peculiar to insurance disputes. The hard issue in the case is why Code of Civil Procedure section 1021[1] does not prohibit recovery by a plaintiff for fees paid to his attorneys in a tort action. The court's answer to that question is that where a plaintiff is necessarily required to pay attorneys to make the plaintiff whole as a result of a tort, amounts paid by the plaintiff to the attorneys are compensatory tort damages and not attorneys' fees: "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting

[1]Code of Civil Procedure section 1021 provides: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to costs and disbursements, as hereinafter provided."

from a tort in the same way that medical fees would be part of the damages in a personal injury action." (*Brandt, supra,* 37 Cal.3d at p. 817.) The court continued, "The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Id.,* at p. 819.)

Nothing about this analysis is peculiar to insurance disputes. In my view, *Brandt* represents an application of the same time-honored principle that led our Supreme Court to authorize recovery of attorney's fees as damages in actions for false imprisonment (*Nelson* v. *Kellogg* (1912) 162 Cal. 621, 623-624 [123 P. 1115]) and malicious prosecution (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]). Because of its nature, some tortious conduct necessarily requires the tort victim to retain an attorney to ameliorate or defend against the wrongful conduct. Thus, in *Nelson* v. *Kellogg, supra,* plaintiff was allowed to recover damages for attorney's fees spent in obtaining her release from a false arrest. (162 Cal. at p. 622.) In *Bertero* v. *National General Corp., supra,* plaintiff could recover as damages attorney's fees paid to defend an action prosecuted maliciously against him. (13 Cal.3d at p. 59.) In *Brandt,* attorney's fees were recoverable as damages where the attorney was retained to obtain insurance proceeds tortiously withheld. (37 Cal.3d at p. 822.)

In none of these instances would we reasonably expect a lay person to be able to remedy the tortious conduct without the services of an attorney.[2] *Brandt*'s express analogy is appropriate: in these cases, attorney's fees are recoverable as damages for the same reason medical fees are recoverable in personal injury actions. (37 Cal.3d at p. 817.) The tort has made it necessary for the tort victim to obtain expert professional services to cure the wrong.

In the instant case, plaintiff, a lay person, has pleaded that, as a consequence of defendants' continuing threats to sue her, she had to obtain the services of attorneys. Because the tortious conduct consisted of wrongful threats to sue plaintiff in a court of law, plaintiff was clearly required to obtain the services of attorneys to defend against and ameliorate the continuing tortious conduct. I do not see why, if plaintiff could have recovered, as damages, attorney's fees spent to defend an action prosecuted malicious-

---

[2]In my view, lay persons are fully capable of settling ordinary personal injury claims. *Brandt* does not open the door to the recovery of attorney's fees as damages in personal injury litigation.

ly, she should not recover, as damages, attorney's fees spent in reasonable efforts to stop the filing of a wrongful action against her. Plaintiff should therefore recover as damages amounts paid to her attorneys as were reasonably necessary to get defendants to stop threatening to sue her.

Since plaintiff should recover, as damages, amounts paid to her attorneys, as outlined above, her cause of action for extortion should survive. As the majority point out, our Supreme Court has recognized that a cause of action in tort, in the nature of duress, is maintainable where one is compelled to pay money to another upon the wrongful threat of prosecution of civil legal action. (See *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 203-205 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803].) In *Leeper,* the money was paid under duress *to a defendant. (Id.,* at p. 202.) However, that fact is immaterial. A cause of action consists of a primary right held by a plaintiff, a primary duty devolving upon a defendant, and the delict or wrong done by the defendant. (*Lodi* v. *Lodi* (1985) 173 Cal.App.3d 628, 631 [219 Cal.Rptr. 117]; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 23, pp. 66-67.) Here plaintiff has a right to live her life free of attempts to extort money from her. She has sufficiently alleged that defendants, by threatening suit without any cause, wrongfully breached a tort duty owed to her. She is entitled to be made whole for her damages regardless of whether her money was paid directly to defendants or to her attorneys. Since plaintiff's first cause of action sufficiently pleads that she suffered damage as a consequence of defendants' wrongful attempts to extort money from her, her first cause of action should survive.

Petitions for a rehearing were denied April 25, 1986, and the petitions of all parties for review by the Supreme Court were denied July 17, 1986.

# APPENDIX A

ROGER T. STEWART, ESQ.
Attorney At Law
California Satellite Systems
3332 Mather Field Road, #115
Rancho Cordova, CA 95670

(916) 369-1601 ·-·  *43-8161*

DECEMBER 6, 1983

M FUHRMAN                                          CASE #: 850347
7530    GARDENGATE DR
CITRUS HEIGHTSCA 95610

I represent California Satellite Systems, the sole licensee for microwave transmission of ON TV programming in the Sacramento metropolitan area.

A recent and on-going survey of your neighborhood reveals that you still have a microwave antenna on your residence which is tuned to and receiving ON TV programming.

A check of my client's paid subscriber rolls indicates that you are receiving this signal without paying the monthly subscriber fee. THE UNAUTHORIZED RECEPTION OF A PAY TV SIGNAL IS IN VIOLATION OF FEDERAL LAW (47 U.S.C. SECTION 605, 18 U.S.C. SECTION 2511, 18 U.S.C. SECTION 2520) ENTITLING US TO DAMAGES OF $100 PER DAY OR A MINIMUM OF $1,000, WHICHEVER IS GREATER, PLUS COURT COSTS AND REASONABLE ATTORNEY'S FEES.

California Satellite Systems has instructed me to file suit against you in Federal Court unless ALL of the following THREE STEPS take place:

   1.   Remove the unauthorized equipment; and

   2.   Sign the enclosed agreement to stop your illegal reception of the ON TV signal; and

   3.   Return this agreement with your check or money order for $275, made payable to California Satellite Systems no later than JANUARY 9, 1984 A return envelope is enclosed for this purpose. This amount is considered to be an out-of-court settlement of all prior claims against you.

If you fail to settle this claim by  JANUARY 9, 1984      , my client's suit in Federal Court will be for considerably more damages. This is your only opportunity to settle this claim for this amount.

Please contact us without further delay.

Very truly yours,

Roger T. Stewart, Esq.
Attorney At Law

RTS/mg                        42
Enclosures

## APPENDIX B

**CALIFORNIA SATELLITE SYSTEMS**
3332 Mather Field Road #115
Rancho Cordova, CA 95670
(916) 369-1601

DECEMBER 30, 1983

M FUHRMAN                                                      CASE #: 850347
7530    GARDENGATE DR
CITRUS HEIGHTSCA 95610

On DECEMBER 6, 1983 our attorney, Roger T. Stewart, notified you of our intent to stop the unauthorized interception of California Satellite Systems' over-the-air signal in the Sacramento area. As of the date of this letter, we have either not received a satisfactory response from you or we have not heard from you at all.

Piracy of pay-TV signals is a nationwide problem. CAL SAT is following the procedures utilized by several other successful anti-piracy programs throughout the country. We have instructed our attorney to pursue this piracy campaign to the fullest extent.

Recently, you may have heard claims that "the airwaves are free" and that, therefore, CAL SAT has no right of action against those who intercept signals. Enclosed is a notice from the Federal Communications Commission which clearly states that it is illegal to receive MDS signals without the authorization of the sender. CAL SAT's signal is an MDS signal.

As outlined in our attorney's letter, JANUARY 9, 1984 is the final date upon which you may settle this matter by the prescribed three steps. I sincerely hope we can settle this unfortunate matter within the next few days. As these anti-piracy programs continue, they only become more costly and create more hardships.

Very truly yours,

CALIFORNIA SATELLITE SYSTEMS

Michael B. Dawson
General Manager

Enc: FCC Notice

43