[Civ. No. 14075. Fourth Dist., Div. One. Jan. 20, 1976.]

A. ESPARZA, Plaintiff and Respondent, v.
MICHAEL RISLEY SPECHT,
Defendant, Cross-complainant and Appellant;
COLUMBUS MUTUAL LIFE INSURANCE COMPANY et al.,
Cross-defendants and Respondents.

## COUNSEL

Luce, Forward, Hamilton & Scripps, C. Douglas Alford, Brian D. Monaghan and Robert B. Coffin for Defendant, Cross-complainant and Appellant.

McInnis, Fitzgerald, Rees & Sharkey and Laurence L. Pillsbury for Plaintiff and Respondent.

Higgs, Fletcher & Mack and Dewitt A. Higgs for Cross-defendants and Respondents.

## OPINION

**COLOGNE, J.**—Plaintiff A. Esparza, a general insurance agent of Columbus Mutual Life Insurance Company (Columbus), filed suit to recover on a promissory note executed by Michael Risley Specht. Specht cross-complained against Richard Weber, salesman for Esparza, Esparza and Columbus for fraud and misrepresentation in the scheme used to obtain the note. Specht sought general and punitive damages and before

trial joined the Ohio National Bank which was an assignee of the note at one time. The trial court granted a nonsuit as against Columbus and Ohio National Bank because they were not shown to be parties to the fraud. Since Specht made no issue of the validity of the note the court allowed recovery on the complaint as against Specht but provided for an offset in the amount of the value of the mutual funds and their expected income. A motion for nonsuit on the cross-complaint was then granted because after the offset was allowed there was no showing of damages. The court refused to submit to the impaneled jury the issue of punitive damages since it found Specht had suffered no actual damages and punitive damages were not available to him by law.

On February 11, 1969, Weber approached Specht, a fellow student and teammate at San Diego State College, and represented he was marketing an "investment program" whereby a qualified college student need merely sign a demand note in the approximate amount of $445, the proceeds of which would be used to purchase certain mutual funds and $25,000 worth of life insurance. Sixty percent of the funds would be invested in mutual funds and the balance used to purchase a whole life insurance policy from Weber's principal, Columbus. From Weber's point of view the program was to generate the sale of life insurance but little mention was made of that. Specht's interest was basically to secure the mutual funds as he had no dependents nor did he have any particular interest in buying insurance for the benefit of anyone else. Specht was told he would only have to pay interest on the loan ($27.84) during the first year and when he got on his feet financially could stay in for as little as $30 a month. Specht liked the idea of getting in without an initial investment. Weber had graphs to show how the investment would produce 15 to 20 percent return based on prior mutual fund statistics. If the more speculative mutuals were bought, the return might exceed that. Specht stated he wanted the more moderate forms of investment and play it "cozy." It was represented the mutual funds in time might be sufficient to pay for a car or presumedly pay off a good portion of the loan.

Numerous other students were offered the same plan and likewise handed brochures describing the "Columbus Plan" and various mutual funds. They too found themselves with insurance only.

Weber never purchased the mutual funds but assigned the note to Esparza for use to provide temporary premium financing for the purchase of life insurance alone. There was evidence Esparza participat-

ed in the fraudulent misrepresentations. The note was endorsed to Esparza who in turn endorsed it to Ohio National Bank of Columbus which advanced the money used to pay for the life insurance policy.

When the interest on the note became due the bank wrote Specht demanding payment. Specht told the bank he wanted to cancel the deal because he did not have the funds to go forward. It was at this time he was advised the mutual funds were never acquired and that the loan proceeds were in fact used to purchase life insurance only.

Specht admitted the validity of the note but defended on the basis of the claimed fraud and counterclaimed for damages for fraud on various theories. After hearing the evidence before a jury, the court determined (1) there was liability on the note but allowed an offset on the note for the benefits Specht would have received had the representation been true,[1] (2) found no damages on the cross-complaint since Specht only promised to pay, signing a note, and had been given full credit on the note for any misrepresentations, and (3) since there were no damages, he was not legally entitled to punitive damages and the court refused to submit that issue to the jury. Judgment was entered in the amount of $203.49. The parties stipulated that the only issue on appeal is the propriety of the court's refusal to submit to the jury the issue of punitive damages.

It must be conceded at the outset that Specht did have a $25,000 life insurance policy in effect during the year before the plan was rescinded

---

[1] It is conceded the note was transferred by way of assignment and the transfer was made subject to the claims of Specht. In computing liability on the note the following computation was made:

| | |
|---|---|
| Principal amount of note | $445.50 |
| Interest to 2/11/70 | 27.84 |
| | 473.34 |
| | |
| Less offset as of 2/11/70 | |
| Represented mutual funds | |
| 60% of 445.50 | $267.30 |
| 1 yr. growth at 15% | 40.10 |
| | 307.40 |
| | 165.94 |
| Interest to date of judgment | 37.55 |
| | $203.49 |

and that Columbus did have exposure for that period. It cannot be denied that the $165.94 is a reasonable sum for that coverage. Esparza asserts Specht received everything he bargained for, and he received value worth what he parted with, so he cannot assert he suffered damage when he is required to pay the agreed price. Specht, on the other hand, claims he did not want *just* life insurance but a package of goods, and by reason of the misrepresentation he was in fact induced to buy a policy he did not want and would not have purchased but for the representation.[2]

■ It is well settled in California that punitive damages cannot be awarded unless actual damages are suffered (*Mother Cobb's Chicken T., Inc.* v. *Fox,* 10 Cal.2d 203, 206 [73 P.2d 1185]; Civ. Code § 3294).[3] ■ The law authorizes punitive damages to discourage oppression, fraud or malice by punishing the wrongdoer. Such damages are appropriate in cases like the present one, where restitution would have no deterrent effect, for wrongdoers would have little or no risk of liability to the victims beyond that of returning what they wrongfully obtained (*Ward* v. *Taggart,* 51 Cal.2d 736, 743 [336 P.2d 534]). Where the plaintiff's recovery is in the form of restitution (*Millar* v. *James,* 254 Cal.App.2d 530, 533 [62 Cal.Rptr. 335]) or requiring the defendant to surrender stock in a close corporation which increases the value of plaintiff's stock (*Topanga Corp.* v. *Gentile,* 249 Cal.App.2d 681, 691 [58 Cal.Rptr. 713]), plaintiff has indeed been damaged even though monetary damages are not awarded. ■ The requirement of "actual damages" imposed by section 3294 is simply the requirement that a tortious act be proven if punitive damages are to be assessed (*Brewer* v. *Second Baptist Church,* 32 Cal.2d 791, 801-802 [197 P.2d 713]).

■ It is essential, then, for us to ascertain whether actual damages were suffered in this case.

At the outset we should point out that Specht had two remedies available to him, (1) rescission, and (2) an action for fraud; he chose the latter (*Kent* v. *Clark,* 20 Cal.2d 779, 783-784 [128 P.2d 868, 142 A.L.R. 576]). In the former he would be allowed to cancel the agreement regardless of damages (*Earl* v. *Saks & Co.,* 36 Cal.2d 602, 611 [226 P.2d 340]) but in the case of fraud he must show actual damage.

---

[2] Undisputed is the fact that Specht was not married, had no children and as a student had no real reason to obtain any substantial amount of life insurance.

[3] Civil Code section 3294 reads as follows: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

The damages recoverable in an action in fraud are fixed by Civil Code section 3343 which reads, in part, as follows:

"(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following:

"(1). . . . . . . . . . . . . . . . . .

"(2) An amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud.

"(3). . . . . . . . . . . . . . . . . .

"(4) Where the defrauded party has been induced by reason of the fraud to purchase or otherwise acquire the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided that lost profits from the use or sale of the property shall be recoverable only if and only to the extent that all of the following apply:

"(i) The defrauded party acquired the property for the purpose of using or reselling it for a profit.

"(ii) The defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property.

"(iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it.

"(b) Nothing in this section shall do either of the following:

"(1). . . . . . . . . . . . . . . . . .

"(2) Deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

After looking to the language of what is now Civil Code section 3343, subdivision (b)(2) preserving any legal or equitable remedies for persons having a cause of action for fraud, the Supreme Court has held the "out-of-pocket" measure of damages under the section as a whole does not preclude the recovery of punitive damages (*Eatwell* v. *Beck*, 41 Cal.2d 128, 134-135 [257 P.2d 643]). The clear import of this holding is that Civil Code section 3294, providing a remedy of punitive damages, is the section governing punitive damages as applied to cases otherwise within Civil Code section 3343 (see *Taylor* v. *Wright*, 69 Cal.App.2d 371, 386 [159 P.2d 980]). We thus look to the "actual damages" requirement of section 3294 to determine a defrauded party's entitlement to punitive damages.

In agreeing to the offset, it is apparent Esparza does not deny Specht was a victim of Weber's fraudulent representation to the extent of $307.40. The parties agreed that the note was the subject of an assignment and Esparza held the note subject to all defenses. The court held there were no damages because it had already given Specht credit for the misrepresentations made. We believe this begs the issue because whether Specht recovers as an "offset" or as "damages" in his cross-complaint, he has been "damaged" by Weber's misrepresentations. As one writer put it, a rose by any other name smells as sweet.

Esparza makes a strong argument that Specht contracted for mutual funds and an insurance policy; the mutual funds together with anticipated income now have been fully credited to Specht so he cannot complain about any damages from the misrepresentations and all that remains due ($165.94) represents what he would have owed for the balance of the package regardless of alleged misrepresentations.[4]

The weakness of this position becomes apparent when viewed in light of the pleadings. The complaint was filed against Specht on the full amount of the note which the court found to be good; and Specht was compelled to answer alleging the fraud (1) to cancel his liability on the note, or (2) to recover damages exceeding the amount of the note. The court did not allow cancellation but only an offset; to gain the offset

---

[4]No contention is made by Specht that the promised mutual funds have intrinsic value or are not now readily obtainable for the price stated. Actually, the market price of the funds is lower than the price used for fixing damages so in giving this offset Specht avoids a loss he would have suffered if the mutual funds had been purchased by Esparza as represented.

Specht had to prove all the elements of his claimed fraud including *damages.*[5]

The trial court easily found liability on the note since Specht had not denied the execution of the note or the fact he had not paid it when due. The prelude to the real issue of the case was explained to the jury but they were not asked to make any factual determination in that regard because the facts were not in dispute. The court then allowed Specht to assume the role of plaintiff, make the initial opening statement and begin presentation of evidence. In order to establish his demand against Esparza Specht was required to plead and prove every element of the fraud including damages, which he did. After Specht had presented considerable evidence Esparza waived his claim for all amounts due except those in excess of $307.40. This may have been done to expedite the trial time for the case but we can only view it as conceding Specht had a proper claim for that amount as a result of the tortious acts of Weber. By waiving his claim, especially at this stage of the trial, Esparza acknowledged Specht suffered "damages." There is no justice in allowing the perpetrator of a fraud to avoid the related consequences of punitive charges attendant with his fraudulent acts simply by paying the actual damages claimed by the defrauded after a bitter lawsuit and before the jury returns what appears to be a certain verdict. Specht suffered damages and proved them though the amount of the damages was applied against the amount due on the note.

Had the note been transferred to a bona fide purchaser for value so that the offset would not have been available, Specht would have been damaged and would have had a claim against Esparza for the damages from fraud. We would have no difficulty finding actual damages of $307.40 to justify a case for punitive damages. Should our result be different merely because Esparza, and not a bona fide purchaser for value, initiates the suit? We believe that would be contrary to justice and equity.

We conclude that for purposes of finding actual damages to justify recovery of punitive damages it is sufficient that the defrauded party show a damage, and not that he must show bottomline damages, i.e., damages over and above all the cross-claims of the perpetrator of the fraud. Specht did suffer damages.

---

[5]Offset is a proper form of relief when cross-demands are made by parties (Code Civ. Proc. § 431.70).

We hold Specht proved sufficient legally compensable damages to justify the issue of punitive damages going to the jury.

Reversed.[6]

Brown (Gerald), P. J., and Ault, J., concurred.

---

[6] In light of the parties' representation at oral argument they have settled the case contingent on resolution of the sole issue, it is unnecessary to accompany our reversal with directions relating to a retrial.