[No. B231970. Second Dist., Div. Four. Oct. 25, 2012.]

KEITH FULLINGTON, Plaintiff and Appellant, v.
EQUILON ENTERPRISES, LLC, et al., Defendants and Respondents.

COUNSEL

Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Wilson Turner Kosmo, Robin A. Wofford, Jocelyn D. Hannah and Katherine M. McCray for Defendants and Respondents.

OPINION

**SUZUKAWA, J.**—This appeal arises out of one of a series of suits between defendant Equilon Enterprises, LLC (Equilon), and plaintiff Keith Fullington (Fullington), a former Equilon franchisee. Fullington appeals the summary adjudication for Equilon of causes of action for fraud and violation of Business and Professions Code section 21148. We reverse.

## FACTUAL BACKGROUND

### I. *Prior Litigation Between the Parties*

Equilon is the successor in interest to Shell Oil Company (Shell) and Texaco, Inc. (Texaco). Fullington is a former Shell lessee-dealer who operated a Shell-branded retail gas station in Rowland Heights, California (the Nogales station).

Equilon was formed in 1998, when Shell and Texaco merged their retail marketing and refining activities. Shell and Texaco contributed to Equilon all of their western refining and marketing assets, and assigned to Equilon all of their gas station leases and dealer agreements. In exchange, Shell and Texaco received 100 percent of the ownership interests in Equilon. Individual Shell and Texaco gas stations continued to sell company products under existing leases and agreements. (*Abrahim & Sons Enterprises v. Equilon Enterprises, LLC* (9th Cir. 2002) 292 F.3d 958 (*Abrahim*).)

After its formation, Equilon terminated a "variable rent program" (sometimes referred to as a VRP) formerly offered to Shell's lessee-dealers. The termination of the variable rent program, as well as the transfer to Equilon of gas station leases and dealer agreements, generated a variety of lawsuits between Equilon and its lessee-dealers. Three such suits are relevant to the present appeal.

### A. *The* HRN *Litigation*

In 1999, Fullington and other independent Shell lessee-dealers who operated Shell-branded service stations in the United States sued Shell, Equilon,

and other defendants in Texas state court. That action was captioned *HRN, Inc. v. Shell Oil Co.* (Harris County, Tex., 234th Jud. Dist., No. 1999-28202) (*HRN*). The operative 10th amended original petition, which is discussed in detail below, alleged that by the manner in which the defendants set wholesale gasoline prices and gas station rent, the defendants breached their contracts with the plaintiffs and committed a variety of torts.

The Texas court granted summary judgment for the defendants on December 14, 2000. The Texas Supreme Court affirmed the grant of summary judgment.

### B. *The* Abrahim *Litigation*

After Shell and Texaco transferred their assets to Equilon, 43 independent dealers who operated Shell or Texaco gasoline stations in Southern California filed suit in *Abrahim*.[1] The *Abrahim* plaintiffs contended that by transferring gas station leases to Equilon without offering the plaintiffs a chance to purchase the stations, Shell and Texaco violated Business and Professions Code section 20999.25, subdivision (a) (section 20999.25), which "prohibits a franchisor from selling, transferring, or assigning an interest in a premises to another person unless he or she first makes a bona fide offer to sell that interest to the franchisee. Alternatively, if the franchisor receives an acceptable offer from another party to buy the premises, the franchisor must offer the franchisee a right of first refusal." (*Abrahim, supra*, 292 F.3d at p. 960.)

The defendants moved for summary judgment, contending that Shell's and Texaco's contributions of gas stations to Equilon was not a sale, transfer, or assignment of the stations to "another person" within the meaning of section 20999.25, subdivision (a). The Ninth Circuit disagreed and reversed the district court's grant of summary judgment for the defendants. It held that Equilon was "another person," and Texaco's and Shell's contributions of assets to Equilon were "transfers," within the meaning of the statute. Thus, "the transaction at issue here was a transfer to another person, Equilon, which triggered the duty to offer the gas stations to the franchisees first." (*Abrahim, supra*, 292 F.3d at p. 963.)

### C. *The* Marquez *Litigation*

On June 24, 2002, 21 Shell and Texaco dealers, including Fullington, filed suit in *Marquez v. Shell Oil Company* (Super. Ct. L.A. County, 2003,

---

[1] Fullington was not a party to the *Abrahim* litigation.

No. BC276367) (cause dism.) (*Marquez*). The *Marquez* plaintiffs alleged that Shell and Texaco failed to offer them the opportunity to purchase their stations before transferring the stations to Equilon, as required by section 20999.25. After the Ninth Circuit's decision in *Abrahim*, Fullington settled his action against the *Marquez* defendants. Under the terms of the settlement, executed July 2, 2003, defendants agreed to pay Fullington 77.5 percent of the increase in the value of the Nogales station between July 1, 1998, and October 29, 2001 (unless the Oct. 2001 value exceeded 165 percent of the July 1, 1998 value, in which case a different formula would be substituted), plus the value of all rent Fullington paid between July 1, 1998, and May 31, 2001, plus interest, less Equilon's actual maintenance and tax expenses for the Nogales station between July 1, 1998, and May 31, 2001, plus interest. In exchange, Fullington agreed to release defendants from liability for all claims against defendants, "[e]xcept for any other lawsuits pending as of the date of this Agreement."

## II. *The Present Action*

On May 29, 2003, Fullington and other lessee-dealers filed the present action against Equilon and four individuals (collectively, Equilon). As relevant to the present appeal, the operative third amended complaint, filed June 16, 2004, alleges as follows:

(1) *Violation of Business and Professions Code section 21148*. Business and Professions Code section 21148 (section 21148) prohibits a franchisor from withholding consent to the sale, transfer, or assignment of a franchise under certain circumstances. As discussed more fully below, Fullington alleged that Equilon violated section 21148 by intentionally interfering with Fullington's attempts to sell his franchise to two separate buyers with whom Fullington had entered escrow. As a direct result of Equilon's conduct, Fullington was not able to sell his franchise and lost his station and business.

(2) *Fraud*. Fullington alleged that before Equilon was formed, Shell routinely allowed its lessee-dealers to reduce their rent through the variable rent program. In 1998, Equilon eliminated the variable rent program and reverted to higher "contract rent." Thereafter, Equilon created the "interim rent challenge" (sometimes referred to as the IRC), by which a lessee-dealer could challenge the contract rent by obtaining an appraisal of the dealer's land, equipment, and improvements, and then using the appraisal to calculate a new fair market value rent. The interim rent challenge was supposed to be made available to all lessee-dealers who complained about their contract rents, but instead was arbitrarily made available to only some lessee-dealers.

In 1999 and 2000, Fullington complained to his Equilon sales consultant, Gary Kirner, about the contract rent. Kirner responded that there was nothing he could do because the rent "comes from Houston." Kirner's statements that he could do nothing and that the rent "comes from Houston" were false and Kirner knew them to be false when he made them. Consistent with a management directive, Kirner did not disclose the interim rent challenge to Fullington. As a result, Fullington alleged that he paid "commercially unreasonable and excessively high contract rent" for two years.

## III. *Equilon's Motions for Summary Judgment*

### A. *Section 21148 Claim (Res Judicata)*

Equilon moved for summary adjudication of Fullington's section 21148 claim, asserting that the claim was barred by res judicata because it arose from the same "transaction" as the claims litigated in *HRN*. Equilon urged that in both *HRN* and the present action, Fullington alleged that Equilon acted with the intent "to force the lessee-dealers to ' "walk away" from their stations for nothing' or to 'substantially reduc[e] the franchisees' goodwill value in order to achieve "dealer buy outs" ' at reduced prices. [Internal record reference omitted.]" Equilon therefore urged that Fullington's section 21148 claim was "related in 'time, space, origin, and motivation' " to the claims and allegations in *HRN*, and thus should have been litigated in a single action.

The court granted summary judgment for Equilon. It explained: "As in HRN, plaintiff Fullington alleges here that Equilon's interference with the sale of his station is demonstrative of Equilon's intent to force its lessee-dealers to ' "walk away" from their stations for nothing' or to 'substantially reduc[e] the franchisees' goodwill value in order to achieve "dealer buy outs" ' at reduced prices. [Internal record reference omitted.] As such, plaintiff Fullington's section 21148 claim is related in 'time, space, origin, and motivation' to the claims and allegations in HRN, and the claims therefore arise from the same 'transaction.' [Citation.]

"In support of his claim, Fullington alleges that the first incident of Equilon's interference occurred in 1999, followed by interference in 'the winter of 1999, early 2000.' [Internal record reference omitted.] Accordingly, plaintiff Fullington's section 21148 claim had accrued before December 2000, when judgment was rendered in HRN, such that he could have raised that cause of action there. [Citation.] Fullington's failure to raise his section 21148 claim in HRN bars him from raising it now."

### B. *Fraud Claim (Prior Settlement)*

Equilon also moved for summary adjudication of Fullington's fraud claim. Equilon asserted that even if it had misrepresented the existence of the interim rent challenge, as Fullington alleged, the only damage Fullington could have suffered was the difference between the rent he actually paid and the lower fair market rent he allegedly would have paid had he known about the IRC. However, as part of the *Marquez* settlement, *all* of the rent Fullington paid after the IRC was implemented was refunded to him. Therefore, "[Fullington] cannot support an essential element of [his] case— that [he was] damaged by Equilon's failure to inform [him] of the existence of the IRC—and [his] fraud claims fail as a matter of law."

Fullington opposed the summary adjudication motion, contending that his fraud damages included not only rent overcharges, but also lost goodwill value and punitive damages. Thus, while he conceded that Equilon was entitled to an offset for the rent overcharges for which he had been compensated, he urged that Equilon was not entitled to summary adjudication of the fraud claim.

The court granted the summary adjudication motion. It said that while Fullington argued that he was seeking to recover more than overpaid rent, including loss of goodwill value, he "offer[ed] absolutely no evidence that [he has] suffered a compensable loss of goodwill value." Further, "it is settled in California that punitive damages cannot be awarded unless actual damages were suffered, the theory being that they are in addition to compensatory damages. See Kizer v. County of San Mateo, 53 Cal.3d 139, 147 [279 Cal.Rptr. 318, 806 P.2d 1353] (1991) ('In California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages.')."

## IV. *Judgment and Appeal*

The court entered judgment for defendants and against Fullington on January 19, 2011. Fullington timely appealed.

### STANDARD OF REVIEW

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "We review a grant of summary judgment de novo [and] decide independently whether the facts not subject to triable

dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].)

## DISCUSSION

### I. *The Trial Court Erred in Granting Summary Adjudication of Fullington's Section 21148 Claim*

■ Fullington contends that his section 21148 claim was not precluded by the final judgment in *HRN*, and thus the trial court erred in granting Equilon's motion for summary adjudication. For the following reasons, we agree.

#### A. *Fullington's Prior and Current Claims Do Not Arise Out of the Same Facts*

■ Because the *HRN* judgment was entered by a Texas court, its res judicata effect is determined by Texas law. (Code Civ. Proc., § 1913 ["the effect of a judicial record of a sister state is the same in this state as in the state where it was made . . ."].) Under Texas law, "[r]es judicata bars the relitigation of claims that have been finally adjudicated or that could have been litigated in the prior action. [Citation.] For res judicata to apply, the following elements must be present: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) the same parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. [Citation.] Thus, a party may not pursue a claim determined by the final judgment of a court of competent jurisdiction in a prior suit as a ground of recovery in a later suit against the same parties. [Citation.] In short, res judicata precludes parties from relitigating claims that have been finally adjudicated by a competent tribunal. [Citation.]" (*Igal v. Brightstar Info. Tech. Group, Inc.* (Tex. 2007) 250 S.W.3d 78, 86, superceded by statute on other grounds as stated in *Lueck v. State* (2010) 325 S.W.3d 752, 764, fn. 11.)

To determine what claims are precluded by an earlier judgment, "we must compare 'the factual matters that make up the gist of the complaint' in each claim. [*Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.* (Tex. 1992) 837 S.W.2d 627, 630.] This transactional approach 'giv[es] weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their

treatment as a trial unit conforms to the parties' expectations or business understanding or usage.' *Id.* at 631 (quoting Restatement of Judgments § 24(2) (1942))." (*Daniels v. Empty Eye, Inc.* (Tex.App. 2012) 368 S.W.3d 743, 754–755, small caps omitted (*Daniels*).)

"The decisive issue is whether [the present] litigation involves the same subject matter as the litigation between these parties that resulted in the previous judgment. If it [does], this action is barred; otherwise, it is not. 'A determination of what constitutes the subject matter of a suit necessarily requires an examination of the factual basis of the claim or claims in the prior litigation.' [Citation.]" (*Cherokee Water Co. v. Freeman* (Tex.App. 2004) 145 S.W.3d 809, 815.) "Put another way, we must analyze the factual matters that make up the gist of the complaint." (*KCCC Props. v. Quality Vending, Inc.* (Tex.App. 2010) 312 S.W.3d 231, 234.)

### 1. *The* HRN *Litigation*

The operative 10th amended original petition in *HRN* (filed Oct. 1, 2000) alleged five causes of action, each of which arose out of Equilon's elimination of the variable rent program and increase in wholesale gasoline prices:

(a) *Fraudulent Inducement*: Plaintiffs alleged that when they contracted with defendants, defendants made false representations and/or failed to disclose material facts, including that plaintiffs would never have to pay "contract" rent. This was untrue; specifically, defendants intended to eliminate the variable rent program and other rent reduction programs.

(b) *Fraud—Variable Rent Program*: Plaintiffs alleged that during the course and development of the variable rent program, Shell made numerous misrepresentations and omissions, including that plaintiffs would pay Shell a maximum rent as set forth in the dealer agreements and that Shell's variable rent program would result in lower rents. Shell "failed to disclose to Plaintiffs the true nature of its rental charges incorporated in the VRP, including the fact that Shell intended to collect, through manipulation of its pricing of Shell gasoline to Plaintiffs, amounts for the rental, use, and occupancy of its service stations in excess of the amounts set forth in the dealer agreements and VRP, and that it was Shell's intention through implementation of the VRP to use it as a scheme to collect amounts from Plaintiffs in excess of the rental amounts Shell represented that it had agreed to accept."

(c) *Negligent Misrepresentation—Variable Rent Program*: Plaintiffs alleged that between 1982 and 1999, Shell offered its lessee-dealers the variable rent program, through which it encouraged lessee-dealers to buy their gasoline at the higher "dealer tank wagon" price, rather than at the lower "rack" price,

and to purchase greater volumes of gasoline. Shell represented that lessee-dealers could reduce their monthly rent by participating in the variable rent program, but did not tell its lessee-dealers that the variable rent program was a vehicle by which Shell intended to, and did, collect additional rent from its dealers. Shell also represented that the variable rent program would always be in place. Shell made these misrepresentations and omissions and did not exercise reasonable care in obtaining or communicating this information.

(d) *Breach of Contract—Variable Rent Program*: Plaintiffs alleged that Shell breached its contractual obligations to plaintiffs by collecting from them amounts in excess of those Shell had agreed to accept from each plaintiff under the dealer agreement, as reduced by the variable rent program.

(e) *Breach of Contract—Open Price Term*: Plaintiffs alleged that Shell breached its contractual obligations to plaintiffs by failing to set the dealer tank wagon prices in good faith, instead charging plaintiffs unreasonably high prices for gasoline, instituting "pad pricing," and including a hidden rent component in dealer tank wagon prices. Further, Shell charged Texaco lessee-dealers a lower dealer tank wagon price. "Thus, even if the lessee-dealers sold gasoline to the public at their cost, the retail price at the jobber stations is still lower than the price at the lessee-dealer stations. Therefore, the lessee-dealers are prevented from competing against the other stations. The lessee-dealers must either lower prices to increase customers and lose money, or keep prices high enough to make a profit, lose customers, and lose money. Again either way, Defendants make money and the lessee-dealers are effectively forced out of business. [¶] . . . As a result of Defendants' marketing plan and practices, and its preferential gasoline pricing for jobbers and company-owned stations, Defendants [are] forcing lessee dealers, such as Plaintiffs, out of business."

## 2. *Section 21148 Claim*

Fullington's fifth cause of action, for violation of section 21148, arises out of Equilon's alleged interference with Fullington's several attempts to sell his Shell franchise. Fullington alleges that in spring 1999, he agreed to terms of sales with a first prospective buyer, who had sufficient capital and assets to run a Shell-branded franchise. Fullington and the first buyer agreed on a purchase price and opened escrow in 1999. The first buyer attended Shell "Dealer School," a training program for new prospective franchisees. While at Dealer School, Joseph Hoffman, an Equilon sales consultant, asked to review the first buyer's business plan. Hoffman told the first buyer that she could never make any money at Fullington's location and should not purchase his station. After returning from Dealer School, the first buyer

cancelled escrow and told Fullington that, based on Hoffman's statements to her, she could not purchase the station.

Fullington found a second prospective buyer in late 1999 or early 2000. Fullington and the second prospective buyer agreed to terms in early 2000 and opened escrow. Fullington's second buyer made several attempts to arrange a meeting with sales consultant Gary Kirner and his boss to discuss plans for the station and get Equilon's consent to assignment of Fullington's franchise. Neither Kirner nor his boss returned any of the second buyer's calls for several weeks. When Kirner and the second buyer finally met, Kirner told the second buyer he should not purchase the station because Equilon had no plans to keep Fullington's station in its network and the station could not be run profitably. Based on Kirner's statements, the second buyer cancelled escrow. Fullington was not able to sell his franchise, and he subsequently lost his station and business.

### 3. Analysis

As the above discussion makes clear, the factual matters that make up the "gist" of the two actions are not the same. *HRN* alleged the elimination of the variable rent program and the increase in the wholesale price of gasoline on a companywide basis. In contrast, the present suit concerns actions taken by two Equilon employees (Hoffman and Kirner) to discourage potential buyers from purchasing Fullington's franchise. Indeed, there is virtually *no* factual overlap between the relevant causes of action in the two actions.

Further, the events relevant to the two suits are separated in time. The *HRN* complaint alleged that Shell implemented the variable rent program in 1982 to "entice the lessee-dealers to enter into contracts with Defendants" and to "collect additional rent from its dealers." It also alleged that "[b]eginning in at least 1995 and continuing to the present," defendants sold Shell-branded gasoline to "jobbers" at lower prices than it sold the same gasoline to lessee-dealers. In contrast, the present complaint alleges that Equilon agents discouraged prospective buyers from purchasing Fullington's franchise in 1999 and 2000.

It also does not appear that the claims alleged in *HRN* and the present case would form a convenient trial unit. *HRN* involved hundreds of plaintiffs and corporate conduct undertaken by unidentified Equilon agents. The section 21148 claim involves a single plaintiff—Fullington—and actions undertaken by two identified Equilon agents, Hoffman and Kirner. Equilon has not identified any efficiencies in combining these groups of claims at trial, nor any basis for concluding that doing so "conform[s] to the parties' expectations, business understanding, or usage." (*Daniels, supra*, 368 S.W.3d at p. 755.)

■ Finally, Equilon has not established that Fullington's section 21148 claim was ripe when the Texas court entered judgment in *HRN*. Res judicata "will not bar a plaintiff's recovery in a subsequent lawsuit absent a showing that the same claims were mature at the time of the prior judgment." (*Collins v. Guinn* (Tex.App. 2003) 102 S.W.3d 825, 832.) In other words, "judgment in one suit will not operate as res judicata to a subsequent suit on the same question between the same parties where, in the interval, the facts have changed, or new facts have occurred which may alter the legal rights or relations of the parties. [Citation.] [¶] For res judicata to apply, a claim must be in existence at the time suit is filed, and cannot merely be [a] prospective anticipated claim. [Citations.] Thus, a judgment does not bar a subsequent action arising from the same set [of] circumstances if the subsequent claim accrued after the original judgment. [Citations.]" (*Hernandez v. Del Ray Chem. Int'l, Inc.* (Tex.App. 2001) 56 S.W.3d 112, 116.)

In the present case, Fullington alleges that he agreed to terms of sale with a first prospective buyer in spring 1999, and with a second prospective buyer in late 1999 or early 2000, but that neither sale was consummated because of Equilon's interference. Fullington alleges that as a result, he was not able to sell his franchise and lost his station and business. However, the complaint does not allege, and defendants do not assert in their statement of undisputed facts, the dates on which Equilon employees allegedly interfered with Fullington's prospective sales, the date on which the prospective buyers allegedly withdrew, or the date on which Fullington lost his station. Accordingly, the record does not conclusively establish that Fullington's section 21148 claim was ripe when the Texas court entered judgment in *HRN* in December 2000.

■ Equilon asserts that Fullington's section 21148 claim necessarily accrued before final judgment in *HRN* because "[i]t is undisputed that the first incident of Equilon's alleged interference with the sale of Fullington's station occurred in 1999. . . . Thus, even if Fullington had not suffered the full extent of his injury until later, his claim for violation of section 21148 accrued and was mature in 1999." We do not agree. A section 21148 violation is not actionable unless a franchisee "*is injured* in his business or property by reason of a violation of this chapter" (Bus. & Prof. Code, § 21140.4, italics added); the date of injury thus is critical to evaluating when Fullington's cause of action accrued. The date of the injury is not alleged in the complaint, however, and Equilon did not submit any evidence relevant to this issue in support of its summary adjudication motion. That is, while the complaint alleges that Fullington agreed to terms of sale with a first prospective buyer in 1999 and that Hoffman interfered with that sale, it does not specify the date of Hoffman's alleged interference. Moreover, although Hoffman's interference presumably occurred before Fullington agreed to terms of sale with a second prospective buyer, allegedly in late 1999 or early 2000, it does not

appear that Fullington had yet suffered any injury because at that time a sale appeared imminent. Indeed, Fullington does not appear to have suffered injury until his second prospective buyer withdrew from escrow, at some unspecified date after "early 2000." Because Equilon did not establish that the withdrawal from escrow occurred before judgment was entered in *HRN* in December 2000, it did not show that Fullington's section 21148 claim accrued before final judgment in *HRN*.

> B. *Fullington's Prior and Current Claims Are Not Barred by Res Judicata Merely Because They Are Based on Actions Taken "For the Same Reason"*

Equilon asserts that even if two claims are based on distinct actions by defendants, the claims arise out of the same nucleus of operative facts—and therefore constitute a single transaction for res judicata purposes—"if the actions were taken *for the same reason.*" Equilon urges that principle applies here because in both *HRN* and the present case, Fullington alleged that Equilon engaged in actionable conduct to "eliminate franchisee lessee-dealers from its business model by 'forcing many Plaintiffs out of business.' "

For the proposition that claims based on actions taken "for the same reason" must be joined in a single suit, Equilon cites just one case, *Motient Corp. v. Dondero* (Tex.App. 2008) 269 S.W.3d 78 (*Motient*). In that case, Motient was a publicly held corporation; Dondero was a member of Motient's board of directors and the president of a limited partnership that owned Motient common stock. (*Id.* at p. 80.) To raise capital, Motient issued preferred stock; at Dondero's request, Motient limited the voting rights of the preferred stockholders so Dondero's limited partnership could purchase the stock without triggering a federal filing requirement. After the preferred stock transaction was closed, Motient's board of directors discovered that the restricted voting rights requested by Dondero potentially conflicted with its certificate of incorporation, and it filed a certificate redesignating the voting rights for the preferred stockholders. Dondero subsequently initiated a proxy fight for control of Motient. (*Id.* at pp. 80–81.)

Motient filed two suits against Dondero. The first action, filed in federal court, alleged that Dondero made false and misleading statements to persuade shareholders to cede control of Motient, and made improper filings in connection with the preferred stock transaction " 'to improperly influence the vote by Motient shareholders on critical corporate transactions and therefore constitute disguised proxy solicitations.' " (*Motient, supra*, 269 S.W.3d at p. 81.) The second action, filed in state court, alleged that Dondero " 'embarked on a course of action designed to undermine and disrupt Motient's

business with the ultimate goal of taking control of Motient in a proxy contest' " in violation of his fiduciary duties as a director of Motient. (*Id.* at p. 82.)

After the federal suit was dismissed, the trial court granted summary judgment for Dondero on his state fiduciary duty claim and the Texas Court of Appeals affirmed. The court explained that under the "transactional" test, "a prior judgment's preclusive effect extends to all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose. [Citation.] What grouping of facts constitutes a transaction or series of transactions must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conf[o]rms to the parties' expectations or business understanding or usage. [Citations.] Under the transactional test, 'the critical issue is not the relief granted or the theory asserted but whether the plaintiff bases the two actions on the same nucleus of operative facts.' [Citation.]" (*Motient, supra,* 269 S.W.3d at p. 83.) In the case before it, Motient's pleadings in both the federal and state suits "described a proxy fight by which Dondero tried to take control of Motient and engaged in certain conduct directed to that end." (*Id.* at pp. 83–84.) The court thus concluded that "the factual scenario of the two actions parallel, and, therefore, the same cause of action is involved in both." (*Id.* at p. 84.)

In so concluding, the court rejected Motient's contention that the facts common to the two actions were "background," not "operative," facts. (*Motient, supra,* 269 S.W.3d at p. 85.) It explained that although Motient's theories of liability arose from Dondero's separate obligations as a shareholder and as a board member, "both suits arise from the actions he took in his alleged attempt to take control of Motient. Whether Dondero acted as a shareholder in violating a federal statute as alleged in the federal suit or as a company director in violating fiduciary duties in this state suit is immaterial because the factual scenario of the two actions parallel. Under the allegations here, the intended proxy fight was not the background to Dondero's actions, but the alleged reason for them." (*Id.* at p. 85.)

Equilon emphasizes the last sentence quoted above, suggesting that under *Motient,* "two different types of actions, which allegedly violate different laws and different obligations, may still arise from the same nucleus of operative facts if the alleged wrongdoer had the same alleged *reason* for taking the actions." We do not agree: While *Motient* says that "motivation" is a relevant factor, it nowhere suggests, as Equilon does, that causes of action *necessarily* arise from the same nucleus of operative facts if the actions were taken "for the same reason." To the contrary, *Motient* emphasized that what

grouping of facts constitutes a single transaction for res judicata purposes must be determined "pragmatically," giving weight to a variety of different factors, of which motivation is only one. (*Motient, supra*, 269 S.W.3d at p. 83.)

Finally, nothing in *Motient*'s analysis suggests that Fullington's section 21148 claim arose from the same nucleus of operative facts as the claims asserted in *HRN*. All of the relevant events in *Motient* took place during the seven months between April 2005 and February 2006, while the events relevant to the claims between Fullington and Equilon spanned 18 years, from 1982 to 2000. Further, while all of the events alleged in *Motient* were part of a proxy fight "by which Dondero tried to take control of Motient and engaged in certain conduct directed to that end" (*Motient, supra*, 269 S.W.3d at pp. 80–81, 83–84), the events relevant to *HRN* and the present suit are alleged to be part of two separate transactions with disparate motivations: The VRP allegedly was implemented to persuade prospective franchisees to enter franchise agreements and leases with the company, and then was eliminated to increase the company's revenue, while defendants' conduct alleged in the present case allegedly was intended to discourage prospective buyers from purchasing Fullington's franchise. And, there is no indication that the decisions to implement the policies alleged in the two cases were made by the same people in the same periods of time. For all of these reasons, the present case is not governed by *Motient*.

### C. *Fullington's Current Claims Are Not Barred by Res Judicata Simply Because They Arise Out of the Same Legal Relationship*

Equilon also asserts that even if two claims are based on distinct actions by an alleged wrongdoer, the claims necessarily arise out of the same nucleus of operative facts if they arise from the same " 'legal relationship, such as under a lease, a contract, or a marriage.' " Thus, Equilon asserts, because Fullington's claims in *HRN* and his section 21148 claim here all arise "out of the franchise relationship between Fullington and Equilon," the present claims are precluded by res judicata.

Equilon is correct that several Texas appellate cases state that "[w]here there is a legal relationship, such as under a lease, a contract, or a marriage, all claims arising from that relationship will arise from the same subject matter and be subject to res judicata." (*Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n* (Tex.App. 2002) 77 S.W.3d 487, 497 (*Pinebrook*).) This rule is not uniformly applied in Texas, however. For example, in *Daniels, supra*, 368 S.W.3d 743, the Texas Court of Appeals declined to apply res judicata to claims brought by the plaintiff against her former husband and business partner. Notwithstanding the dual marital and business relationship

between the parties, the court held that the divorce decree did not preclude the wife's subsequent breach of fiduciary duty claims against her ex-husband because "the record does not establish conclusively that [the husband's] petition for divorce arose from the same transaction as the claims for breach of contract and breach of fiduciary duty asserted by [the wife]" and the record "does not show that treatment of the division of the marital estate and litigation of the contract and fiduciary-duty claims as a 'trial unit' would have conformed to the parties' expectations, business understanding, or usage." (*Id.* at p. 755.)

The Texas Court of Appeals reached a similar result in *Brown v. Dr. Michael D. Hoffman & Assocs.* (Tex.App. 2003) 111 S.W.3d 826 (*Brown*). There, the defendants employed the plaintiff for more than 25 years. After she was terminated, the plaintiff brought two separate suits against the defendants, one asserting that she was owed more than $300,000 from the employer's profit-sharing plan, and a second asserting breach of the termination agreement. (*Id.* at p. 828.) The court held the first lawsuit did not preclude the second: "Although appellees argued in their summary judgment motion that the two actions are both based on 'Brown's termination and Brown's acrimonious relationship with Dr. Hoffman prior to and after her termination,' we cannot agree. The operative facts in these cases are not grounded in appellant's termination; rather, each was based on a separate and distinct contractual obligation. The federal lawsuit involved the distribution of a profit-sharing fund and therefore had to be filed in federal court. In contrast, the state lawsuit centered on appellees' alleged obligations to appellant pursuant to a letter agreement. The facts necessary to prove the state claim are distinct from any fact necessary to prove the federal claim. Under these circumstances, we cannot conclude these causes of action arise from the same nucleus of operative facts." (*Id.* at pp. 829–830; see *Rivera v. City of Laredo* (Tex.App. 1997) 948 S.W.2d 787 [suspended police officer's appeal of his suspension did not preclude his subsequent suit against the city to declare the police chief's appointment and any disciplinary actions taken by him as police chief void].)

In view of *Daniels* and *Brown*—as well as our conclusion that the rule articulated in *Pinebrook* is in conflict with the transactional approach to res judicata adopted by the Texas courts—we decline to find that under Texas law all claims arising from a legal relationship necessarily arise from the same subject matter and thus are subject to res judicata. We therefore find that the franchisor-franchisee relationship between Equilon and Fullington does not support the trial court's grant of summary judgment.

## II. *The Trial Court Erred in Granting Summary Adjudication of Fullington's Fraud Claim*

Fullington's cause of action for fraud asserts that but for Equilon's intentional misrepresentations, Fullington would have reduced his monthly rent by taking advantage of the "interim rent challenge" that Equilon offered some of its lessee-dealers. Because he was not advised of the interim rent challenge, he paid "commercially unreasonable and excessively high contract rent" for two years.

Equilon's motion for summary adjudication asserted that Fullington's fraud cause of action failed as a matter of law because Fullington could not establish that he suffered any damage as a result of the alleged fraud. Equilon argued that even if Fullington could prove that it made fraudulent misrepresentations, Fullington's measure of damages would be the difference between the rent he *actually* paid and the lower fair market rent he allegedly *would have* paid had he known about the interim rent challenge. However, as part of the *Marquez* settlement, Equilon had already refunded *all* of the rent Fullington paid after the interim rent challenge was implemented. Equilon asserted that Fullington therefore could not establish the damages element of his fraud claim.

There is no dispute that if Fullington prevails on his fraud claim, Equilon will be entitled to an offset for the rent overcharges for which it already has compensated Fullington. There also is no dispute that the offset to which Equilon will be entitled under these circumstances exceeds the actual damages for fraud that Fullington can recover in this action. What *is* disputed is whether the damages for which Fullington already has been compensated can satisfy the "actual damages" element of a fraud cause of action, and thus support a punitive damages award.

Equilon says no, urging that "[b]ecause there are no compensable damages *now*, Fullington cannot obtain an award of punitive damages." In other words, Equilon urges that when it settled the *Marquez* action, it did not merely obtain an offset against any future damages award Fullington might win in connection with his alleged overpayment of rent—it fatally undermined Fullington's ability to pursue any cause of action in connection with that alleged overpayment. Fullington contends to the contrary, urging that what matters is whether he suffered a compensable injury, *not* whether he has been compensated for that injury by another party or through another lawsuit. Thus, he says that notwithstanding the *Marquez* settlement, he can state a cause of action for fraud (and recover punitive damages) because Equilon's fraudulent conduct caused him actual injury. For the following reasons, Fullington is correct.

## A. *Cases Applying California Law*

We are not aware of any California case that has addressed the precise issue raised here—whether a plaintiff's recovery of compensatory damages in a first suit eliminates his tort causes of action in a second suit. However, both a California court and a federal district court applying California law have addressed closely related punitive damages issues, and their decisions inform our analysis here.

California law permits an award of punitive damages only if a plaintiff suffers "actual injury." (*Gagnon v. Continental Casualty Co.* (1989) 211 Cal.App.3d 1598, 1602 [260 Cal.Rptr. 305].) This rule is "based on the principle that the defendant must have committed a tortious act, i.e., an actionable wrong causing injury or damage, before punitive damages may be assessed." (*Id.* at p. 1603, fn. 5.) The plaintiff/cross-defendant (plaintiff) invoked this rule in *Esparza v. Specht* (1976) 55 Cal.App.3d 1 [127 Cal.Rptr. 493] (*Esparza*), to argue that because the defendant/cross-complainant's (defendant) actual damages were entirely offset by the plaintiff's recovery, the defendant should not be allowed to recover punitive damages. In *Esparza*, the plaintiff sued to recover on a promissory note, and the defendant cross-complained for fraud. (*Id.* at pp. 3–4.) The trial court determined that the defendant was liable on the note for $473 (plus interest), but was entitled to an offset of $267 (plus one year's growth at 15 percent) for fraud damages. Because the plaintiff's recovery exceeded the defendant's, the court determined that the defendant did not suffer net damages and thus could not recover punitive damages. (*Id.* at p. 5.)

The Court of Appeal reversed. It said although it is "well settled" that punitive damages cannot be awarded unless actual damages are suffered, the requirement of actual damages "is simply the requirement that a tortious act be proven if punitive damages are to be assessed (*Brewer v. Second Baptist Church* [(1948)] 32 Cal.2d 791, 801–802 [197 P.2d 713])." (*Esparza, supra*, 55 Cal.App.3d at p. 6.) Thus, when a plaintiff's recovery "is in the form of restitution (*Millar v. James* [(1967)] 254 Cal.App.2d 530, 533 [62 Cal.Rptr. 335]) or requiring the defendant to surrender stock in a close corporation which increases the value of plaintiff's stock (*Topanga Corp. v. Gentile* [(1967)] 249 Cal.App.2d 681, 691 [58 Cal.Rptr. 713])," plaintiff has been damaged and may recover punitive damages even though compensatory damages are not awarded. (*Esparza, supra*, at p. 6.)

In the case before it, it was undisputed that the defendant "was a victim of [a] fraudulent representation to the extent of $307.40." (*Esparza, supra*, 55 Cal.App.3d at p. 8.) Thus, the court held the defendant had suffered actual injury and could recover punitive damages. It explained as follows: "There is

no justice in allowing the perpetrator of a fraud to avoid the related consequences of punitive charges attendant with his fraudulent acts simply by paying the actual damages claimed by the defrauded after a bitter lawsuit and before the jury returns what appears to be a certain verdict. [The defendant] suffered damages and proved them though the amount of the damages was applied against the amount due on the note. [¶] Had the note been transferred to a bona fide purchaser for value so that the offset would not have been available, [the defendant] would have been damaged and would have had a claim against [the plaintiff] for the damages from fraud. We would have no difficulty finding actual damages of $307.40 to justify a case for punitive damages. Should our result be different merely because [the plaintiff], and not a bona fide purchaser for value, initiates the suit? We believe that would be contrary to justice and equity. [¶] We conclude that for purposes of finding actual damages to justify recovery of punitive damages it is sufficient that the defrauded party show a damage, and not that he must show bottomline damages, i.e., damages over and above all the cross-claims of the perpetrator of the fraud. [The defendant] did suffer damages." (*Id.* at p. 9.)

A federal district court applied *Esparza* to a case very like the present one in *Yates v. Nimeh* (N.D.Cal. 2007) 486 F.Supp.2d 1084 (*Yates*). There, the plaintiff brought two separate cases alleging "churning" of an investment account. (*Id.* at p. 1086, fn. 4.) In the first case, the plaintiff recovered a sizable award of compensatory and punitive damages against one group of defendants. In the second case against a different group of defendants, the plaintiff acknowledged full satisfaction of the compensatory damages portion of the first judgment, and further admitted he could not recover any additional compensatory damages from those defendants. He contended, however, that he could recover punitive damages against the second group of defendants based on their alleged involvement in the underlying fraud. The defendants disagreed and moved to dismiss the complaint for failure to state a claim on which relief could be granted pursuant to the "single satisfaction" rule, under which an injured person is entitled to only one satisfaction of judgment for a single harm. (*Id.* at p. 1086.)

The district court denied the motion to dismiss. (*Yates, supra,* 486 F.Supp.2d at p. 1087.) It explained that the single satisfaction rule " ' "is equitable in its nature," ' " and in the case before it, there was no danger of double recovery because any award of compensatory damages would be offset by the satisfaction of the first judgment. The court also rejected the defendants' contention that the plaintiff's claim must fail because an award of compensatory damages is a prerequisite to an award of punitive damages under California law. It explained: "The rule . . . is that an award of compensatory damages *or its equivalent* is a prerequisite to an award of punitive damages. [Citations.] In other words, '[t]he requirement of "actual damages" imposed by section 3294 is simply the requirement that a tortious act be proven if punitive

damages are to be assessed.' *Esparza* v. *Specht*[, *supra*,] 55 Cal.App.3d 1, 6 [127 Cal.Rptr. 493] . . . . [¶] Thus, where a claimant's award of compensatory damages was completely offset, he could still receive punitive damages. See *Esparza*, 55 Cal.App.3d at 9 (cited with approval in *Cheung* [v. *Daley* (1995)], 35 Cal.App.4th [1673,] 1677 fn. 8 [42 Cal.Rptr.2d 164]). Here, plaintiff has already demonstrated the commission of a tortious act, and may yet prove defendants' liability for some part of the damages arising therefrom. It does not follow that because plaintiff's compensatory damage claim may be completely offset, he is automatically precluded from recovering punitive damages against defendants. [Fn. omitted.]" (*Yates, supra,* at pp. 1087–1088, some italics added.)

### B. Cases from Other States Holding That a Plaintiff May Pursue a Second Suit After Receiving Full Satisfaction of Judgment in a First Suit

The supreme courts of several states also have addressed the question before us, holding that a plaintiff may pursue a second suit even after receiving full satisfaction of judgment in a first suit. *Sanchez v. Clayton* (1994) 117 N.M. 761 [877 P.2d. 567] (*Sanchez*) is one such case. There, the plaintiffs lost their jobs after complaining to their employer, New Mexico Highlands University (the university), about the cost of services provided to the university by Servicemaster, an independent contractor. The plaintiffs filed a federal suit against university employees for civil rights violations. The plaintiffs attempted to join Servicemaster as a defendant, but Servicemaster successfully resisted the motion. The plaintiffs subsequently brought a state court action against Servicemaster for tortious interference with contract and breach of contract. (*Id.*, 877 P.2d at p. 570.)

A federal jury found the university violated the plaintiffs' First and Fifth Amendment rights, and the court entered judgment for the plaintiffs for $750,000. The university appealed from the judgment, and the plaintiffs cross-appealed from the denial of prejudgment interest. (*Sanchez, supra,* 877 P.2d at p. 570.) While the federal appeal was pending, the parties settled for $700,000 and executed a release of judgment, which included a clause stating, " '[T]his release . . . is not intended to release or absolve Servicemaster . . . from any liability . . . or damages . . . arising from the termination of plaintiffs and presently pending in [state case against Servicemaster].' " (*Ibid.*)

Following the settlement of the federal case, Servicemaster moved for and was granted summary judgment in the state case on the grounds that the plaintiffs had been fully compensated for their damages. The New Mexico Supreme Court reversed, explaining: "The determinative issue in this case is

whether Plaintiffs can state a cause of action under which they would be entitled to compensatory or nominal damages against Defendants. *Whether the prior judgment for compensatory damages may have been paid in full is not determinative* in deciding that punitive damages may be awarded against Defendants. All the law requires is that '[t]he conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory [or nominal] damages *were* allowed.' [Citation.]" (*Sanchez, supra*, 877 P.2d at p. 574, italics added.)

The South Carolina Supreme Court adopted the reasoning of the *Sanchez* court in *McGee v. Bruce Hospital System* (2001) 344 S.C. 466 [545 S.E.2d 286] (*McGee*). There, the plaintiff's wife died as a result of her doctor's improper placement of a central venous catheter. The plaintiff sued the doctor and hospital. Following a first trial, the court dismissed the plaintiff's case against the hospital on a directed verdict motion, and a jury returned a verdict against the doctor. The Supreme Court affirmed the judgment against the doctor but reversed the directed verdict for the hospital. Before a second trial against the hospital commenced, the doctor paid the verdict in full and the plaintiff executed a satisfaction of judgment. The hospital then urged that the plaintiff's claim against it should be dismissed because the judgment had been satisfied. The trial court agreed and granted a directed verdict for the hospital. (*Id.* at p. 287.)

The South Carolina Supreme Court reversed. After quoting the *Sanchez* decision at length, the court concluded that the courts below had "incorrectly stated that since the issue of actual damages could not be submitted to the jury, there was no legal liability upon which to predicate a verdict for punitive damages. To the contrary, under the reasoning of our law and *Sanchez v. Clayton, supra*, the issue of [the hospital's liability] can be submitted to the jury and if the jury determines [the hospital] is liable, the jury can then decide whether punitive damages against [the hospital] are warranted. [¶] . . . [¶] . . . [The plaintiff] should not be denied the opportunity to have a jury determine whether [the hospital] is liable for punitive damages." (*McGee, supra*, 545 S.E.2d at pp. 288–289; see *Taylor v. Compere* (Mo.Ct.App. 2007) 230 S.W.3d 606 [defendant in second suit not entitled to summary judgment, even though plaintiff had recovered full satisfaction of judgment in a first suit against other defendants]; *Medearis v. Miller* (N.D. 1981) 306 N.W.2d 200, 204 [" 'The rule providing that a satisfied judgment against a tortfeasor bars suit against others jointly responsible for the same injury "is predicated upon the equitable theory of unjust enrichment which forbids greater recovery than the loss or injury sustained." [Citation.] Where double recovery for the same injury does not occur, suit against other liable tortfeasors has been permitted notwithstanding the entry of a satisfaction of judgment. . . . Punitive damages awarded against one tortfeasor do not

constitute double recovery with respect to a judgment against another tortfeasor since the purpose of punitive awards is to punish a particular offender rather than to compensate the victim for its injury.' "]; *Turner v. Firstar Bank, N.A.* (2006) 363 Ill.App.3d 1150, 1160 [300 Ill.Dec. 927, 845 N.E.2d 816] [borrower sued lender and towing company for wrongful repossession of her vehicle; *held*: borrower could maintain suit against lender even after towing company satisfied judgment for compensatory damages; "[t]he fact that these compensatory damages were satisfied by [towing company] prior to the trial against the defendant does not negate the existence of the award of damages or of the injuries from which that award flowed."].)

### C. *Analysis*

 We believe that the rule adopted in *Yates, Sanchez*, and *McGee* is consistent with California law, and we adopt it here. California law has a variety of doctrines—none of which Equilon invoked here—that prohibit the filing of multiple suits arising out of the same wrongful conduct. If none of those doctrines applies—and thus the *filing* of two separate actions does not offend California law—we perceive no reason why the *maintenance* of one action should become impermissible because a judgment or settlement is entered in the other. Nor do we see why a party should be permitted to avoid an award of punitive damages in one action—intended to "punish the wrongdoer and to make an example of him" (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 77 [139 Cal.Rptr.3d 849])—by paying compensatory damages in another. We thus hold that Fullington's recovery of his compensatory damages in *Marquez* does not preclude his stating a fraud claim here.

Equilon contends that the present case is fundamentally different than *Esparza*, where the defendant "proved actual, compensable damages at the time of trial," because "Fullington cannot prove actual, compensable damages at the time of trial." We do not agree. Although it is true that *Esparza* differs from the present case procedurally—here, Fullington was compensated for his compensatory damages *before* trial, while the *Esparza* defendant was compensated by an offset awarded *at* trial—Equilon suggests no reason (and we can conceive of none) why the procedural difference should be material to the outcome.

 Equilon also contends that it is a "fundamental principle of punitive damages" that "compensable actual damages are an absolute prerequisite to an award of punitive damages." Not so. As our Supreme Court explained long ago, "The rule that exemplary damages cannot be imposed unless the plaintiff has suffered actual damages (*Clark* v. *McClurg* [(1932)] 215 Cal. 279 [9 P.2d 505]; *Haydel* v. *Morton* [(1935)] 8 Cal.App.2d 730 [48 P.2d 709]) is

based on the principle that the defendant must have committed a tortious act before exemplary damages can be assessed." (*Brewer v. Second Baptist Church, supra,* 32 Cal.2d at pp. 801–802; see *McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1164 [29 Cal.Rptr.2d 559] [quoting *Brewer*].) In other words, the question relevant to determining whether a plaintiff may recover punitive damages is whether he or she suffered a tort for which the law permits the recovery of damages—*not* whether those damages have (or have not) already been paid. Because Fullington allegedly suffered such a tort, his recovery of actual damages in *Marquez* should not bar his recovery of punitive damages here.

Equilon contends finally that the present case is governed by *Berkley v. Dowds* (2007) 152 Cal.App.4th 518 [61 Cal.Rptr.3d 304] (*Berkley*), which it says holds that "in California, there must be a concurrent *award* of compensatory damages (or an equivalent award, such as nominal damages, restitution, or an offset) to support an award of punitive damages." *Berkley* does not so hold. *Berkley* was an action by a medical corporation to recover amounts allegedly owed for medical services provided to a decedent before his death; decedent's wife cross-claimed on behalf of herself and decedent's estate, alleging among other things that decedent's doctor caused decedent severe emotional distress by urging his wife to " 'pull the plug' " after decedent suffered catastrophic injuries in a car accident. (*Id.* at pp. 523, 530.) The court held that decedent's wife could not state a cause of action for intentional infliction of emotional distress (IIED) because under Code of Civil Procedure section 377.34, a decedent's pain and suffering is not compensable in an action brought by his personal representative after his death. Thus, the court said, the cause of action for IIED did not allege a wrong for which decedent could be compensated. The court also rejected the decedent's wife's contention that the possibility of recovering punitive damages would, by itself, support the cause of action for IIED, explaining that "[t]here must be a recovery of actual damages to support an award of punitive damages." (152 Cal.App.4th at p. 530.)

■ Equilon emphasizes the *Berkley* court's use of the phrase "recovery of actual damages" to suggest that "in California, there must be a concurrent *award* of compensatory damages . . . to support an award of punitive damages." The only issue before the *Berkley* court, however, was whether damages *to which the plaintiff was not entitled as a matter of law* could support an award of punitive damages. The court did not consider the issue relevant to the present case: Whether damages that already had been recovered in a separate action could support a punitive damages award. As cases "are not authority for propositions not considered," we "decline to read [*Berkley*] for more than it expressly holds." (*People v. Brown* (2012) 54 Cal.4th 314, 330 [142 Cal.Rptr.3d 824, 278 P.3d 1182].)

## DISPOSITION

We reverse the summary adjudication of Fullington's second and fifth causes of action (for fraud and violation of § 21148). Fullington shall recover his costs on appeal.

Willhite, Acting P. J., and Manella, J., concurred.