Filed 7/22/13  Escamilla v. Ace Atlantic Corp. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| VERONICA ESCAMILLA,<br><br>   Cross-complainant, Cross-defendant and Appellant,<br><br>   v.<br><br>ACE ATLANTIC CORPORATION,<br><br>   Cross-defendant, Cross-complainant and Respondent;<br><br>P&B ATLANTIC, LLC,<br><br>   Cross-defendant and Respondent. | B237647<br><br>(Los Angeles County Super. Ct. No. EC049958) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Milton, Judge.  Affirmed in part and reversed in part with directions.

Hunt Ortmann Palffy Nieves Darling & Mah, John D. Darling and Kathlynn E. Smith for Cross-complainant, Cross-defendant and Appellant.

Sahm Manouchehri, Attorney at Law, and Sahm Manouchehri for Cross-defendants, Cross-complainant and Respondents.

_____

## INTRODUCTION

Veronica Escamilla appeals from a judgment in favor of Ace Atlantic Corporation and P&B Atlantic, LLC on her cross-complaints and in favor of Ace on its cross-complaint. She claims that there is insufficient evidence to support the compensatory damages award against her, and that the punitive damages award against her is unauthorized, violates her due process rights, and is excessive. We agree with her first contention and reverse the judgment as to Ace's cross-complaint. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Lease and Sublease*

Veronica Escamilla owns property located at 10862 Atlantic Avenue in Lynwood, California. On September 22, 1997 Escamilla leased the property to GCM Hand Carwashing, Inc. pursuant to a commercial lease (Master Lease). GCM operated a carwash on the property.

Paragraph 11 of the Master Lease provided: "Tenant at its cost shall maintain during the term of this Lease on the Premises a policy . . . of standard fire and extended coverage insurance to the extent of at least ninety (90%) percent of full replacement value thereof. Said insurance policies shall be issued in the names of Landlord and tenant, as their interests may appear. [¶] Tenant at its cost shall maintain during the term of this Lease on all its personal property, Tenant's improvements, and alterations in or about the Premises, a policy of standard fire and extended coverage insurance, with vandalism and malicious mischief endorsements, in the extent of their full replacement value."

In 2003 GCM assigned the Master Lease to AAV, LLC pursuant to a First Amendment to Commercial Lease and Consent To Assignment, signed by Escamilla and GCM's principals. At Escamilla's request, AAV made rent payments to Krystal Enterprises, Inc., which is wholly owned by Escamilla.

2

In 2005 AAV sold the carwash business to Ace Atlantic Corporation (Ace). AAV entered into a sublease agreement with Ace on September 30, 2005. The sublease agreement incorporated the terms and conditions of the Master Lease. On the same date Escamilla, AAV, and Ace executed a Consent to Sublease and a Consent to Assignment of Lease, whereby Escamilla approved both the sublease agreement and assignment of the Master Lease to Ace.

B.     *The Insurance Dispute*

According to Escamilla, AAV consistently failed to provide her with insurance certificates on the property when AAV renewed the insurance. When she tried to have the business appraised, AAV refused to cooperate and produce documents. A friend told her that AAV's insurance policy did not provide for full replacement value. In September or October 2008 Escamilla retained attorney L. Carlos Simental to help her get the certificate of insurance and to increase the amount of coverage.

From January through June 2009 Escamilla and Krystal Enterprises sent a series of letters to AAV claiming that AAV was in breach of paragraph 11 of the Master Lease. Specifically, they claimed that the amount of insurance on the property was not equal to 90 percent of the full replacement value as required by paragraph 11, and Escamilla was supposed to be designated as an additional insured.[1]

Ace was insured through Oregon Mutual Insurance Company and had insured the property for $480,000. By June 2009 Ace had increased the insurance on the property to $630,000 and had added Krystal Enterprises as an additional insured. Escamilla, however, wanted more. She believed that the replacement cost for the property was $1 million, because that was the figure Simental had given her, and that the insurance on the property was inadequate, because that was what Simental had told her. She did not know that Oregon Mutual had obtained a Commercial Building Valuation in November 2009

---

[1]     At trial, and contrary to her deposition testimony, Escamilla also claimed that the insurance on the property was the wrong type of insurance.

3

that determined that the full replacement cost was $872,000. The trial court found Escamilla's testimony in this regard "did not appear credible."

C.    *Escamilla's Attempts To Increase the Rent or Terminate the Lease*

Brothers Parviz and Bijan Bina are the principals of Ace, which purchased the carwash from AAV. About six months after the purchase they met Escamilla and Hakopian, Escamilla's ex-husband. Hakopian, who had served time in prison from 1996 to 2001 for convictions for wire fraud and selling illegal fuel, gave the impression that he was the landlord. A few months after that meeting the Binas met with Hakopian, who told them that he wanted to raise the rent on the property but not under the lease. Hakopian said he was underpaid and wanted a couple thousand dollars more per month. When the Binas refused to pay more rent Hakopian became upset and said he would try to break the lease and take the carwash.

Bijan Bina learned of the insurance problem from AAV. After receiving several letters from Simental, he contacted Hakopian. Hakopian said that he was not involved in the matter, Simental was responsible, and Bijan should contact Simental. Bijan contacted Simental, who said that if Ace paid more rent, everything would be okay.[2]

AAV retained attorney Gary Daglian to represent it in the insurance dispute. When Daglian discovered that Simental had written several letters to Ace, rather than to AAV, he became concerned. After AAV provided proof of insurance to Escamilla that did not satisfy her, Daglian called Simental to find out what the problem was. Daglian also wrote to Simental on March 16, 2009, telling him that he had spoken to the insurance broker, Victoria Blackwood, to whom Simental had referred AAV. Blackwood advised AAV that the policy was adequate and complied with the lease terms. Simental responded that Blackwood was not credible and was not qualified to render an opinion on

---

[2]    The trial court found that Bijan Bina was a credible witness and noted that "[n]either Hakopian nor Simental testified to deny the evidence of their threats to get more rent."

4

the adequacy of the insurance. Simental also demanded that AAV add Krystal Enterprises as a named insured on the policy rather than a loss payee or additional insured.

On March 24, 2009 Simental wrote: "Let me be clear regarding my client's feelings on this matter. My client believes that collectively the original tenant, AAV, LLC and Ace Atlantic corporation took advantage of Veronica Escamilla. The original lease and options were presented by the original tenant to Ms. Escamilla to sign and did not reflect what she believed was the agreement regarding market rent during the option periods. Since this is the tenant's lease form and not the landlord's lease form and the fact that my client is receiving below market rent for the premises, they intend to aggressively enforce each and every term on the lease that protects the premises and benefits them. If your client is interested in renegotiating the lease, my client would be very open to this."

Daglian believed it would be better to increase the insurance coverage and appease the landlord than to litigate the disputes among the parties. He therefore asked Simental to provide him with "a range of what they believe is a full replacement value" of the property, indicating that AAV would increase the insurance coverage, within reason, to fall within that range. Simental responded that he and Escamilla were not qualified to give an opinion on the matter.

Simental then raised other lease violations and asked for additional coverage. Daglian contacted Tim Williams, who had been the insurance broker for the carwash since 1997, to make sure the policy complied with Simental's requests. Williams testified that the form of the policy on the carwash had been the same since 1997, and that Escamilla never complained about the policy when GCM and AAV operated the carwash. Williams repeatedly asked Simental for a figure for replacement costs, but Simental would not provide one.

On April 4, 2009 Parviz Bina contacted Williams to increase the amount of insurance on the carwash to $1 million, even though the replacement cost was $872,000.

He hoped this would appease Escamilla.[3]  Simental, however, was not satisfied and he asked for the appraiser's resume.  The trial court found that Simental's conduct was "outrageous" because he was "attempting to find a way to breach the lease."[4]

On April 8, 2009 Simental wrote to Daglian demanding that the policy name the landlord as an insured on the policy.  In addition, Simental stated that he intended to investigate Ace and its relationship with AAV.  Simental stated that if he "discover[ed] any impropriety regarding the tenant in possession, we will seek to have the lease immediately terminated."  On May 1, 2009 Simental wrote to Daglian and raised a number of issues with respect to the insurance policy, including complaints about the type of insurance and the form of the policy.  He stated that AAV had breached the lease and that the landlord was exercising its right to terminate the lease or to cure the default and include the additional expense as added rent.  On May 4, 2009 Simental notified Daglian that the landlord was exercising its option to cure the default.

Daglian responded by asking what Simental wanted AAV to do.  Daglian, hoping to avoid a rent increase, offered to use an appraiser of Simental's choice and to pay up

---

[3]    The trial court "believed this testimony one hundred percent."

[4]    Of course, there is nothing "outrageous" about attempting to breach a commercial lease.  A contracting party may attempt to breach a contract, as long as if the attempt is successful he or she pays the non-breaching party's damages.  (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516 ["the law generally does not distinguish between good and bad motives for breaching a contract"]; *Ortiz v. Lyon Management Group, Inc.* (2007) 157 Cal.App.4th 604, 619 ["the law ordinarily assigns no moral blameworthiness to breaching a contract"]; *XCO Intern. Inc. v. Pacific Scientific Co.* (7th Cir. 2004) 369 F.3d 998, 1002 ["contract breakers often are innocent in a moral sense"]; *Patton v. Mid-Continent Systems, Inc.* (7th Cir. 1988) 841 F.2d 742, 750 ["if the promisor fails to perform as agreed, he has broken his contract even though the failure [was] in no way blameworthy"]; *Churchey v. Adolph Coors Co.* (Colo. 1988) 759 P.2d 1336, 1350 ["[w]hile the average member of the community may not approve of someone who breaches a contract, such conduct is not '. . . outrageous in character'"]; *Trout v. Umatilla County School Dist. UH3-Milton-Freewater* (Or.App. 1985) 712 P.2d 814, 816 ["[p]roof of a breach of contract will not support a finding of outrageous conduct"].)

6

front for insurance that the landlord chose. Simental responded by requesting 13 items, including information on the employees working at the carwash, payroll costs, an itemized list of personal property on the premises, and other items that Daglian felt were unrelated to insurance coverage.

Escamilla testified that she retained Simental on March 24, 2009, and he told her that she had been taken advantage of in the original lease negotiations. When asked what happened in 2009 to cause her to pressure the tenants to increase the insurance, Escamilla testified that she had been requesting certificates of insurance all along, and that she had in fact first retained Simental in 2008. At this point in the trial the trial court "made a note in bold print that Escamilla did not appear to be credible." Escamilla testified that she preferred Ace remain on the premises and comply with the terms of the Master Lease. She said that she retained Simental because the property did not have proper coverage and was underinsured, not because she wanted to increase the rent. She acknowledged having sent some letters to AAV and Ace that she did not produce during discovery. The trial court noted Escamilla "tried to dance around that issue and made a note that the witness was not credible."[5]

E.    *The Litigation*

On June 4, 2009 AAV filed a complaint for declaratory relief against Escamilla and Krystal Enterprises. AAV alleged that Escamilla's claim that it breached the Master Lease was pretextual and her real goal was to renegotiate the lease in order to obtain a higher rent. AAV sought a declaration regarding the requirements of paragraph 11 of the Master Lease, whether Escamilla or Krystal Enterprises was the landlord under the lease, whether the landlord could demand compliance with paragraph 11 from Ace as the

---

[5]    Similarly, when Escamilla explained that she asked AAV to pay rent to Krystal Enterprises for tax reasons, even though Krystal Enterprises was not the landlord and neither Krystal Enterprises nor Hakopian was Simental's client, the trial court "made another note in bold print that the witness did not appear to be credible."

subtenant rather than AAV as the tenant, and whether the landlord could communicate directly with Ace.

On August 3, 2009 Escamilla and Krystal Enterprises, represented by Simental, filed a cross-complaint against AAV, Ace, P&B, and GCM for breach of contract, "violation of the law constituting a failure of consideration," fraud in the inducement, fraud by deceit, and breach of the implied covenant of good faith and fair dealing. Escamilla and Krystal Enterprises alleged that the cross-defendants breached paragraph 11 of the Master Lease by failing to maintain proper insurance on the property. Escamilla and Krystal Enterprises alleged that AAV and Ace failed to provide them with a copy of their registration and surety bond posted with the California Labor Commissioner and a certificate of workers' compensation insurance coverage as required by paragraph 6 of the Master Lease. Escamilla and Krystal Enterprises further alleged that AAV and Ace fraudulently represented that AAV had sold the carwash to Ace, when in fact AAV had sold the carwash to P&B. Escamilla and Krystal sought compensatory and punitive damages.

After several rounds of demurrers, motions to strike, and amended pleadings, Escamilla, now the only cross-complainant, filed a second amended cross-complaint asserting causes of action for breach of contract, "breach of contract by fraud," "violation of the law constituting a failure of consideration," and breach of the implied covenant of good faith and fair dealing against AAV and Ace.[6]

On February 19, 2010 Ace filed a cross-complaint against Escamilla for breach of contract and tortious interference with contract. Ace alleged that Escamilla breached the Master Lease by demanding a rent increase, and that she interfered with the sublease agreement between AAV and Ace. Ace sought compensatory and punitive damages. Ace's first amended cross-complaint added a cause of action for breach of the implied

---

[6]     The cause of action for "breach of contract by fraud" did not survive another demurrer.

8

covenant of good faith and fair dealing, also based on Escamilla's actions in attempting to pressure Ace into paying increased rent.

On July 26, 2010 Escamilla filed a cross-complaint to Ace's cross-complaint naming Ace, AAV, and P&B as cross-defendants. Escamilla claimed breach of contract based on a decision by the labor commissioner that the carwash was not registered, the unauthorized sale of the carwash to P&B, the failure to inform Escamilla of a $900,000 note secured by the sublease, and labor law violations. She also included a cause of action for ejectment. Numerous motions to strike, motions to amend, discovery motions, and motions for judgment on the pleadings ensued.

### G. *Trial and Judgment*

Following a four-day court trial the trial court issued a statement of decision. On AAV's complaint for declaratory relief the trial court found that the full replacement value of the carwash was $903,000, paragraph 11 of the Master Lease required insurance for 90 percent of that amount or $812,700, and AAV had insured the property for $1 million.[7] The trial court found that the insurance AAV had provided was more than adequate, the policy complied with all lease requirements, and AAV was not in breach of the Master Lease. The court also noted that Escamilla's failure to object to the form of the policy for 14 years waived any objection.

On Escamilla's cross-complaints the trial court found that Escamilla presented no credible evidence of any breach of lease by AAV or Ace. The court found that any "Labor Code violations were a pretext to try to breach the lease or cancel the lease. These were minor things and were not tantamount to material breaches of the lease. . . . The Court believes they were pursued in bad faith by Escamilla at the urging of her attorney Simental." The court found "Escamilla and her agents acted in bad faith by attempting to break the lease without good cause or any reasonable justification

---

[7] The insurance policy was in Ace's name.

9

whatsoever. Termination of the lease will not happen. Escamilla suffered no damages, and she is not entitled to any attorneys fees and costs."

The trial court also found that there was no sublease agreement between AAV and P&B, and that the Binas had sought to purchase the carwash business as partners but, on the advice of their attorney, they formed P&B as a limited liability company. Because their attorney advised them to do business as a corporation, they formed Ace to purchase the carwash business. The court found "that the P&B issue does not amount to a material breach of the lease."

On Ace's cross-complaint, the court found that Ace had spent $7,800 in additional insurance premiums since June 4, 2009 for excess insurance "caused by Escamilla's and Simental's attempts to break the lease." The court found, "by overwhelming evidence, that Escamilla acted in bad faith in attempting to frustrate AAV's and Ace's performance. Escamilla's motive was to increase the rent." [8] The court also found "that there was never a problem until Simental [came in and] attempted to cause a breach of the lease at the urging of Hakopian, Escamilla's husband. The Court was stunned that Simental, an attorney would engage in that kind of misconduct. . . . On that basis, the court finds that a hundred thousand dollars ($100,000) in punitive damages to be paid by Escamilla to

---

[8]    Although the trial court's statement of decision is not entirely clear on the theory of liability, the trial court must have concluded that Escamilla interfered with the sublease between AAV and Ace by making Ace's performance more difficult. (See *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1129 ["interference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance is made more costly or more burdensome"]; *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1131 ["'the tort of "inducing breach of contract" has expanded to permit liability where the defendant does not literally induce a breach of contract, but makes plaintiff's performance of the contract "more expensive or burdensome"'"].) Despite language in the trial court's statement of decision criticizing Escamilla for interfering with AAV's performance of the Master Lease, Escamilla cannot be liable for interfering with the Master Lease because she is a party to it. (See *Applied Equipment Corp. v. Litton Saudi Arabia, Ltd.*, *supra*, 7 Cal.4th at pp. 517-518; *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 265.)

10

Ace is reasonable in light of the actions of Escamilla and her agents, the damage done to Ace and the value of the carwash in 2009 of more than nine hundred thousand dollars."

AAV, Ace, and P&B filed motions for attorneys' fees and costs. Escamilla, still represented by Simental, filed objections to the statement of decision and opposed the motions by Ace and P&B for attorneys' fees and costs.

On September 23, 2011 the trial court entered judgment in favor of Ace and P&B and against Escamilla. The court awarded Ace and P&B $7,800 in compensatory damages, and, "based upon the evidence sufficiently establishing 'bad faith' on the part of Escamilla and/or her agents and based upon the evidence sufficiently establishing Escamilla's intent to improperly terminate the Master Lease and Sublease agreements," the court awarded Ace $100,000 in punitive damages against Escamilla. The court further found that Ace was the prevailing party on Escamilla's cross-complaint and awarded Ace attorneys' fees and costs in the amount of $66,049.

Escamilla, now represented by new counsel, subsequently moved to set aside and vacate the judgment and enter a new and different judgment. Escamilla argued that the award of punitive damages was not supported by the evidence and was not reasonably related to the amount of compensatory damages, and that the award of compensatory damages was not supported by the evidence. Escamilla also filed a motion for new trial based on irregularity in the proceedings, improper court orders, abuse of discretion, excessive damages, insufficiency of the evidence, decision contrary to law, and error in law. Escamilla also filed opposition to AAV's motion for attorneys' fees and costs.

On November 30, 2011 the court entered judgment in favor of AAV and against Escamilla. The court declared that the full replacement value of the carwash was $903,000, that the $1,000,000 insurance policy was sufficient and complied with all requirements of the Master Lease, and that AAV was not in breach of the Master Lease. The court awarded AAV $7,659.84 in costs and $152,500 in attorneys' fees. The trial court denied motions to set aside the judgment and for a new trial.

11

On November 28, 2011 Escamilla filed a timely notice of appeal from the September 23, 2011 judgment in favor of Ace and P&B.**9**

## DISCUSSION

A.    *Standard of Review*

Where, as here, there is a statement of decision containing factual findings and conclusions of law, "we review the trial court's conclusions of law independently and its findings of fact for substantial evidence." (*M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1519, fn. 12; see *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.)  We examine the entire record to determine if there is substantial evidence, contradicted or uncontradicted, that supports the findings and judgment.  (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24.)  In reviewing the evidence, we defer to the trial court's credibility determinations (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 188; *Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1417) and do not reweigh the evidence (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465.)

Substantial evidence is evidence "'""of ponderable legal significance.  Obviously the word cannot be deemed synonymous with "any" evidence.  It must be reasonable . . . , credible, and of solid value. . . .' [Citation.]  The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record.  [Citation.]  While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." [Citation.]' [Citation.]" (*Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1512.)

---

**9**     On January 4, 2012 Escamilla filed a notice of appeal from the November 30, 2011 judgment in favor of AAV.  She voluntarily dismissed that appeal.

B.    *Compensatory Damages*

Escamilla's argues that the award of compensatory damages is not supported by substantial evidence.  We agree.

At the conclusion of trial, counsel for Ace stated that he was asking for $7,800 in compensatory damages, based on the increased insurance costs Ace was forced to pay. The trial court agreed that was an appropriate amount.  The trial court's statement of decision states that the evidence showed "the excess insurance is costing Ace about $200 per month or $7,800 since June 4, 2009," and concludes that Ace was damaged in that amount.

The record supports the trial court's finding that Ace was damaged by having to pay for excess insurance.  There is no substantial evidence in the record, however, to determine the amount of the overpayment.  Bijan Bina testified that in 2009 he was paying about $550 per month for insurance.  When he took over the lease in 2005 he was paying around $230 per month.  The original policy on the carwash for 2008-2009 had an annual premium of $3,583, or $298.59 per month.  That policy, however, provided only $230,000 in replacement value coverage for the buildings on the property.

There is no evidentiary basis for the conclusion that Ace was overpaying $200 per month for insurance.  There was no testimony as to how much the policy would have cost had it included coverage on the buildings in the amount of $812,700, the amount required under the Master Lease.  The finding that Ace was overpaying $200 per month for insurance does not "''"'rest on the evidence'''" but is "''"'the result of mere speculation or conjecture.''''"  (*Frei v. Davey*, *supra*, 124 Cal.App.4th at p. 1512.)

Ace argues that substantial evidence not only supports the award of $7,800 in compensatory damages, but supports an even higher award.  Ace argues that "Bijan Bina of ACE testified at trial that the present monthly insurance premium ACE was paying was $550.00 while the proper amount would be $230.00," so that "Ace was overpaying in insurance premiums in the amount of $320.00 per month since April 2009 (i.e., 30 months).  That totals $9,600.00 in overpayment."  The problem with Ace's argument is that it mischaracterizes the evidence.  Bijan Bina testified he was paying $230 per month

13

in insurance premiums when he took over the lease in 2005. He did not testify that $230 was the "proper amount" required to obtain adequate coverage required by paragraph 11. *No one* testified as to the "proper amount" of monthly premiums for the coverage required by paragraph 11.

Ace also points out that the parties "presented [two] expert witnesses in regards to the adequacy and cost of insurance that was in accordance with the Master Lease." Neither of these witnesses, however, testified as to the cost of an insurance policy providing coverage on the buildings in the amount of $812,700, as required by paragraph 11. Ace does not identify any specific evidence in the record to support the trial court's award of compensatory damages.

Finally, "'where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper.'" (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919.) "When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence . . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper." (*Ibid.*; see *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 289 [directing the trial court to enter judgment in favor of the defaulted defendant where the plaintiff's "effort to prove up his damages was wholly insufficient to sustain any award of damages in his favor"]; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 [reversal "based on insufficiency of the evidence" after the "[p]laintiff had a full opportunity to present its evidence" entitled the defendant to judgment on the complaint]; *Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1210 [landlord not entitled to recover cost of repair damages was "not entitled to a new trial to prove some other measure of damages"]; *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 834 ["[n]o new trial is warranted and the [defendant] is entitled to judgment in its favor"

14

where "[p]laintiffs had a full opportunity to present their evidence, which was insufficient as a matter of law"].)

Ace failed to prove an element of its cause of action for interference with contract—damages. (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55; *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, *supra*, 50 Cal.3d at p. 1126 and fn. 2.) Escamilla is entitled to judgment.

### C.    *Punitive Damages*

"In California, as at common law, actual damages are an absolute predicate for an award of exemplary or punitive damages." (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147; accord, *Fullington v. Equilon Enterprises, LLC* (2012) 210 Cal.App.4th 667, 674; see *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 530 ["There must be a recovery of actual damages to support an award of punitive damages."]; *Jackson v. Johnson* (1992) 5 Cal.App.4th 1350, 1357-1358 ["punitive damages award is invalid" where jury awarded "'damages in the sum of *0 dollars*'"].) Where "the evidence fails to establish a basis to recover any of the damages awarded" by the trier of fact, "the punitive damages award must be reversed because punitive damages cannot be awarded without actual damages." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 758.) Therefore, the award of punitive damages against Escamilla cannot stand in the absence of a judgment in Ace's favor on its cause of action for interference with contract.[10]

---

[10]    Because Escamilla has not raised any claims of error with respect to her cross-complaint against Ace, she has forfeited any such claims (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 126) and we affirm that portion of the judgment (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177-1178).

## DISPOSITION

The judgment is reversed as to Ace's cross-complaint against Escamilla, and the trial court is directed to enter judgment in favor of Escamilla and against Ace on Ace's cross-complaint.  The judgment is affirmed as to Escamilla's cross-complaint against Ace.  Escamilla is to recover her costs on appeal.

SEGAL, J.[*]

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.